1   LTL ATTORNEYS LLP
    James M. Lee (Bar No. 192301)
2   300 S. Grand Avenue, Suite 1400
    Los Angeles, CA 90071
3   Tel: (213) 612-3737
    Fax: (213) 612-3773
4   Email: james.lee@ ltlattorneys.com

5   Attorneys for Plaintiff
    Thomas McKeever
6

7
                    **UNITED STATES DISTRICT COURT**
8
                   **NORTHERN DISTRICT OF CALIFORNIA**
9

10

11

12   THOMAS McKEEVER,                    CASE NO.: 3:18-cv-2851

13                  Plaintiff,
                                         COMPLAINT FOR:
14
          v.                             1. BREACH OF CONTRACT
15                                       2. SPECIFIC PERFORMANCE
                                         3. DECLARATORY JUDGMENT
16   OPENSPEND, INC., a Delaware         4. CAL. BUS. PROF. CODE
     corporation; SEAN MANEY, an            SECTION 17200
17   individual, and DOES 1 through 10,

18                  Defendants.
                                         DEMAND FOR A JURY TRIAL
19

20

21

22

23

24

25

26

27

28

                                                              COMPLAINT

Plaintiff Thomas McKeever complains of Defendants OpenSpend, Inc. and Sean Maney and alleges as follows:

### JURISDICTION AND VENUE

1.      This action arises under diversity of citizenship. The District Court has jurisdiction under Title 28 U.S.C. § 1332 and Fed R Civ P 8(a).

2.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claim and the actual harm to Plaintiff occurred in this District by reason of the Defendants' conduct as alleged below.  Venue is proper in any judicial district in which any defendant would be amenable to personal jurisdiction.

3.      Defendants are subject to the personal jurisdiction in this District as a result of the following: (i) Defendants' knowledge that Plaintiff resided in this District at the time of entering the agreements; (ii) Defendants' knowledge that the injury would be likely to be suffered in this District; and (iii) Defendants conduct or solicit business within this District, have targeted this jurisdiction with the conduct giving rise to this action and have availed itself of the privilege of doing business in this jurisdiction.

### PARTIES

4.      Thomas McKeever is an individual residing in this District.

5.      OpenSpend, Inc. is a corporation incorporated under the laws of the state of Delaware with its headquarters at 1300 Soldiers Field Road, Suite 2, Boston, Massachusetts 02135.

6.      Sean Maney is an individual that upon information and belief resides in either or both of Austin, Texas and Boston, Massachusetts. Mr. Maney is the

-1-

founder, President and owner of more than fifty percent (50%) of OpenSpend, Inc.

7.      The identities of the fictitiously named Defendants are not currently known, and this complaint will be amended to include the names of such individuals or entities, when the same is known.

8.      Plaintiff is informed and believes, and on that basis alleges, that at all relevant times mentioned in this complaint, Defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other and were acting within the scope and authority of that agency and with the knowledge, consent and approval of each other.

9.      Further, Plaintiff is informed and believes and based thereon alleges that Defendants, and each of them, are the alter ego of one another in that neither of the business entitles are or were properly capitalized, corporate formalities are and were not followed, and that Defendant Sean Maney uses the entity shells for his own personal affairs.

## DIVERSITY OF CITIZENSHIP AND AMOUNT IN CONTROVERSY

10.     There is diversity of citizenship between the parties.

11.     The amount in controversy is in excess of $75,000.

## FACTS GIVING RISE TO THIS ACTION

12.     OpenSpend is in the business of providing a back-office software solution to hair salon operators.  Although OpenSpend had grown since its founding, Mr. Maney realized that he was not adept at providing mature organizational structure to the business.  The company was in organizational disarray where corporate formalities and basic finance procedures were not

1   followed.  As the company began to scale, these issues became more and more

2   pronounced. Accordingly, in 2016, Defendants began to search for executives

3   with deep experience as the company expanded.

4       13.     One of the positions that they needed was a Chief Operating Officer

5   and General Counsel.  Defendants' search lead them to Mr. McKeever.  Mr.

6   McKeever was the former general counsel of a NASDAQ listed company

7   (acquired by another publicly listed company).  Mr. McKeever was living in his

8   hometown of San Francisco and acting as interim general counsel for another

9   NASDAQ company when Mr. Maney approached him about joining.

10      14.     Accordingly, in August 1, 2016, Defendants presented Mr.

11  McKeever an employment contract.  The employment contract outlined his salary

12  and option shares and vesting schedule.

13      15.     Mr. McKeever worked solely for stock options from his hire date in

14  or about July 2017 through December 31, 2017.  Thereafter he earned both cash

15  and a reduced number of stock options.

16      16.     In October 2016, in a regular meeting, OpenSpend's Board of

17  Directors approved a stock option plan and granted stock options to a number of

18  employees and other individuals, including Mr. McKeever.

19      17.     Also in October 2016, Mr. McKeever and Mr. Maney on behalf of

20  OpenSpend signed two Notice of Stock Option Agreements (attached as Exhibit

21  "A" and "B" to this complaint).

22      18.     Mr. McKeever's work at OpenSpend as its COO and General

23  Counsel was met with indifference by Mr. Maney.  Whereas Mr. McKeever

24  realized that various organizational steps were needed to remedy operational

25  issues, and that these issues would exacerbate as the Company grew, Mr. Maney

26  showed little interest in Mr. McKeever's suggestions for structural improvements.

27  For example, Mr. Maney questioned the need for: (a) license agreements with

28

-3-

1  OpenSpend's customers; (b) a professional valuation of OpenSpend before
2  issuing stock options; and (c) holding board meetings.  On information and belief,
3  although OpenSpend was formed in or about 2011, OpenSpend held one board
4  meeting prior to an October 2016 board meeting organized by Mr. McKeever.

5      19.    The relationship deteriorated when in June 2017, Mr. Maney
6  terminated Mr. McKeever.

7      20.    The next month, Mr. McKeever sent exercise notices along with two
8  checks of $5,503.41 and $4,876.92 (total $10,380.33) to exercise vested options
9  for 54,088 shares and 61,149 shares. Defendants promptly cashed these checks.

10     21.    Mr. Maney and OpenSpend, acknowledged Mr. McKeever's
11  entitlement to the shares.  During severance negotiations, in an email dated July
12  27, 2017 Mr. Maney told Mr. McKeever OpenSpend would provide him (among
13  other things) $10,000 in return for a proxy to vote his shares.  The severance
14  arrangement was never consummated as Mr. Maney would not agree to a mutual
15  release.  Further, an email dated September 1, 2017, from Kim Walsh on
16  OpenSpend's finance team stated Mr. McKeever would receive his stock
17  certificates when stock certificate software was implemented.

18     22.    Upon information and belief OpenSpend has issued stock certificates
19  to all shareholders other than Mr. McKeever.

20     23.    Mr. McKeever has asked for stock certificates to be issued on
21  multiple occasions.  Without any stated or good reason, OpenSpend has not
22  issued them.  Upon information and belief, these shares are valued in excess of
23  $75,000.

24     24.    To date, without any explanation, Defendants have failed to deliver
25  Mr. McKeever's stock certificates despite acknowledging receipt of the exercise
26  notices and cashing Mr. McKeever's checks almost one year ago.

27

28

1

## FIRST CLAIM FOR RELIEF

2

## BREACH OF CONTRACT

3

4       25.    Plaintiff repeats and realleges and incorporates by reference the

5   allegations in paragraphs 1 through 24 above as though fully set forth herein.

6       26.    Plaintiff has performed all obligations and complied with all

7   conditions and requirements under the Notice of Grant Stock Option and its related

8   vesting schedule.  To the extent that Plaintiff has not performed all obligations and

9   complied with all of the conditions and requirements his performance has been

10  excused, waived, prevented or made impossible or impracticable by Defendants.

11      27.    Defendants have breached the Stock Option Agreement by failing to

12  deliver the promised and paid for shares of OpenSpend stock.

13      28.    As a direct and proximate cause of defendants' breaches, Plaintiff has

14  suffered damages because he has been deprived of the bargained-for benefit of his

15  contract with OpenSpend, *i.e.*, the OpenSpend stock.

16      29.     In addition to mandatory injunctive relief or damages, Plaintiff is

17  entitled to compensation for his expenses in this litigation.

18

19

## SECOND CLAIM FOR RELIEF

20

## SPECIFIC PERFORMANCE

21

22      30.    Plaintiff repeats and realleges and incorporates by reference the

23  allegations in paragraphs 1 through 29 above as though fully set forth herein.

24      31.    OpenSpend is a privately held company.  Its shares are not publicly

25  traded.  The stock certificates evidencing ownership are therefore unique.

26

27

28

32.     Plaintiff has performed all duties, promises, and obligations required of him by the Stock Option Agreements to fully exercise his option rights, and all conditions precedent have been satisfied.

33.     Within the time prescribed by the Stock Option Agreements, Plaintiff paid the full purchase price for the exercise of his option rights under the Stock Option Agreements.

34.     Because Plaintiff has fully exercised his option rights under the Stock Option Agreement, OpenSpend is required to transfer all shares of OpenSpend pursuant to the requirements of the Stock Option Agreements.

35.     Plaintiff has demanded that OpenSpend immediately transfer stock certificates underlying the shares to Plaintiff, but Defendants without any stated reason continue to fail to deliver and transfer the shares. Accordingly, OpenSpend is in breach of the Stock Option Agreement.

36.     Plaintiff has no adequate remedy at law to enforce the provisions of the Stock Option Agreement, other than specific enforcement of the Stock Option Agreement.  OpenSpend is a privately-held company and its share are not publicly traded.

37.      Plaintiff is entitled to specific performance of the terms, conditions, and provisions of the Stock Option Agreement.

## THIRD CLAIM FOR RELIEF
## DECLARATORY RELIEF

38.     Plaintiff realleges and incorporates by reference paragraphs 1 through 37 above as though fully set forth herein.

39.     An actual controversy has arisen and now exists between the parties relating to Plaintiff's status as shareholder of OpenSpend and its related rights.

-6-

1    40.    Plaintiff has validly exercised his option rights pursuant to the Stock

2  Option Agreements and has therefore requested that Defendants recognize his

3  status as shareholder.  Plaintiff has sent letters to Defendants making such

4  requests.

5    41.    Defendants have not responded to Plaintiffs' letters and have not

6  recognized Plaintiff's status as a shareholder.

7    42.    Plaintiff seeks a judicial declaration that he is a shareholder of

8  OpenSpend.

9

10    **FOURTH CLAIM FOR RELIEF**

11    **CAL. BUS. AND PROF. CODE SECTION 17200**

12    43.    Plaintiff realleges and incorporates by reference paragraphs 1

13  through 42 above as though fully set forth herein.

14    44.    Defendants have committed acts of unfair business practice as

15  defined in California Business and Professions Code section 17200 et seq. by

16  failing to deliver the stock certificates after cashing the checks by Plaintiff.

17    45.    Under section 17200 et seq., this Court is authorized to enter such

18  judgment or order as may be necessary to restore to any person in interest the

19  money or property acquired by Defendants through their unlawful and unfair

20  business practices.

21    46.    Plaintiff is, therefore, entitled to a judgment requiring Defendants to

22  deliver the stock certificates to which he was and is entitled but which has been

23  denied him by reason of Defendants' conduct alleged herein.

24    47.    Plaintiff has no plain, speedy, or adequate remedy at law, and will

25  continue to violate systematically the provisions of sections 17200 et seq.

26    48.    Pursuant to section 17205 of the California Business and Professions

27  Code, the remedies and penalties provided by section 17200 et seq. are

28

cumulative to the remedies and penalties available under all other laws of California.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment in its favor against Defendants as follows:

1. That the Court award all damages associated with each cause of action asserted in this complaint, including incidental and consequential damages flowing from Defendants' conduct;

2. An order of specific performance ordering that Defendants deliver the stock certificates to Plaintiff;

3. Costs of suit and attorneys' fees;

4. And that Plaintiff be granted such other and further relief as the equities of the case may require and as this Court may deem just and proper under the circumstances.

DATED:  May 14, 2018                    LTL ATTORNEYS LLP


By_____
James M. Lee
Attorneys for Plaintiff
Thomas McKeever

-8-

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

DATED:  May 14, 2018                    LTL ATTORNEYS LLP


By_____
     James M. Lee
     Attorneys for Plaintiff
     Thomas McKeever

-9-

# EXHIBIT A

# OPENSPEND, INC
# NOTICE OF GRANT OF STOCK OPTION

The Participant has been granted an option (the *"Option"*) to purchase certain shares of OpenSpend, Inc (the *"Company"*) pursuant to the OpenSpend, Inc Stock Incentive Plan (the *"Plan"*), as follows:

| | |
|---|---|
| **Participant:** | Tom McKeever |
| **Date of Grant:** | October 24, 2016 |
| **Number of Option Shares:** | 133,417 |
| **Exercise Price:** | $0.09 |
| **Initial Vesting Date:** | August 15, 2016 |
| **Option Expiration Date:** | The date 10 years after the Date of Grant |
| **Tax Status of Option:** | NONSTATUTORY STOCK OPTION |

**Vested Shares:**   Except as provided in the Award Agreement, the number of Vested Shares (disregarding any resulting fractional share) as of any date is determined by multiplying the Number of Option Shares by the *"Vested Ratio"* determined as of such date as follows:

| | Vested Ratio |
|---|---|
| On Initial Vesting Date, provided the Participant's Service has not terminated prior to such date <u>Plus</u> | 1/12 |
| For each additional month of the Participant's continuous Service from Initial Vesting Date until the Vested Ratio equals 1/1, an additional | 1/12* |
| *This grant to convert to cash salary per terms of offer letter dated August 1, 2016. | |

Capitalized terms not defined herein shall have the meaning as set forth in the Stock Incentive Plan.

Notwithstanding the vesting schedule described above, nor any terms of the Stock Option Agreement and/or Plan, in the event a Change in Control occurs, and within 18 months of the Change in Control, Participant's Service either is terminated by the Company without Cause or Participant terminates his or her Service due to Company action that results in a material diminution in Participant's position, duties, responsibilities or compensation without Participant's consent, except in connection with termination of Service for Cause, 100% of the unvested portion of this Option shall become immediately vested.

Except as provided in the immediately preceding paragraph, upon termination of Participant's Service, any portion of the Option that is not vested and exercisable as of such date of termination shall automatically expire in accordance with the Award Agreement.

The Exercise Price represents an amount the Company believes to be no less than the fair market value of a Share as of the Date of Grant, determined in good faith in compliance with the requirements of Section 409A of the Code. However, there is no guarantee that the Internal Revenue Service will agree with the Company's determination. A subsequent IRS determination that the Exercise Price is less than such fair market value could result in adverse tax consequences to the Participant. By signing below, the Participant agrees that the Company, its Directors, Officers and shareholders shall not be held liable for any tax, penalty, interest or cost incurred by the Participant as a result of such determination by the IRS. The Participant is urged to consult with his or her own tax advisor regarding the tax consequences of the Option, including the application of Section 409A.

**REPURCHASE RIGHTS - PARTICIPANT HEREBY AGREES THAT ALL OPTION SHARES ACQUIRED UPON THE EXERCISE OF THE OPTION SHALL BE SUBJECT TO CERTAIN REPURCHASE RIGHTS AND RIGHTS OF FIRST REFUSAL EXERCISABLE BY THE COMPANY AND ITS ASSIGNS. THE TERMS OF SUCH RIGHTS ARE SPECIFIED IN THE ATTACHED OPTION EXERCISE AGREEMENT.**

By their signatures below, the Company and the Participant agree that the Option is governed by this Grant Notice and by the provisions of the Plan and the Award Agreement, both of which are attached to and made a part of this document. The Participant acknowledges receipt of copies of the Plan and the Award Agreement, represents that the Participant has read and is familiar with their provisions, and hereby accepts the Option subject to all of their terms and conditions.

OPENSPEND, INC

By: _____
*Sean Maney*
472223312A0F467...

Its: _____
President

Address:

PARTICIPANT
Thomas McKeever

Signature _____
*Thomas Mckeever*
3D79A7017B2B475...

Date  10/28/2016
_____

Address  2250 North point #7, SF, CA 94123
_____

ATTACHMENTS: OpenSpend, Inc Stock Incentive Plan, as amended to the Date of Grant; Award Agreement and Exercise Notice

DocuSign Envelope ID: EE7284F6-8E05-437F-89CB-CCEBC56CDE42

[CALIFORNIA ONLY] THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAVE NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102, OR 25105 OF THE CALIFORNIA CORPORATIONS CODE.  THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH SALE OR DISPOSITION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

# OPENSPEND, INC
# STOCK OPTION AWARD AGREEMENT
# (IMMEDIATELY EXERCISABLE)

OpenSpend, Inc has granted to the Participant named in the *Notice of Grant of Stock Option* (the "**Grant Notice**") to which this Award Agreement is attached an Option to purchase certain Shares upon the terms and conditions set forth in the Grant Notice and this Award Agreement. The Option has been granted pursuant to and shall in all respects be subject to the terms and conditions of the OpenSpend, Inc Stock Incentive Plan (the "**Plan**"), as amended to the Date of Grant, the provisions of which are incorporated herein by reference.  By signing the Grant Notice, the Participant: (a) acknowledges receipt of, and represents that the Participant has read and is familiar with the terms and conditions of, the Grant Notice, this Award Agreement and the Plan, (b) accepts the Option subject to all of the terms and conditions of the Grant Notice, this Award Agreement and the Plan, and (c) agrees to accept as binding, conclusive and final all decisions or interpretations of the Board upon any questions arising under the Grant Notice, this Award Agreement or the Plan.

1. **DEFINITIONS AND CONSTRUCTION.**

    1.1. **Definitions.**  Unless otherwise defined herein, capitalized terms shall have the meanings assigned to such terms in the Grant Notice or the Plan.

    1.2. **Construction.** Captions and titles contained herein are for convenience only and shall not affect the meaning or interpretation of any provision of this Option Agreement.  Except when otherwise indicated by the context, the singular shall include the plural and the plural shall include the singular.  Use of the term "or" is not intended to be exclusive, unless the context clearly requires otherwise.

2. **TAX CONSEQUENCES.**

    2.1. **Tax Status of Option.**  This Option is intended to have the tax status designated in the Grant Notice.

**a. Incentive Stock Option.** If the Grant Notice so designates, this Option is intended to be an Incentive Stock Option within the meaning of Section 422(b) of the Code, but the Company does not represent or warrant that this Option qualifies as such. The Participant should consult with the Participant's own tax advisor regarding the tax effects of this Option and the requirements necessary to obtain favorable income tax treatment under Section 422 of the Code, including, but not limited to, holding period requirements. (NOTE TO PARTICIPANT: If the Option is exercised more than three (3) months after the date on which you cease to be an Employee (other than by reason of your death or permanent and total disability as defined in Section 22(e)(3) of the Code), the Option will be treated as a Nonstatutory Stock Option and not as an Incentive Stock Option to the extent required by Section 422 of the Code.)

**b. Nonstatutory Stock Option.** If the Grant Notice so designates, this Option is intended to be a Nonstatutory Stock Option and shall not be treated as an Incentive Stock Option within the meaning of Section 422(b) of the Code.

**2.2. ISO Fair Market Value Limitation.** *If the Grant Notice designates this Option as an Incentive Stock Option*, then to the extent that the Option (together with all Incentive Stock Options granted to the Participant under all stock option plans of the Participating Company Group, including the Plan) becomes exercisable for the first time during any calendar year for shares having a Fair Market Value greater than One Hundred Thousand Dollars ($100,000), the portion of such options which exceeds such amount will be treated as Nonstatutory Stock Options. For purposes of this Section 2.2, options designated as Incentive Stock Options are taken into account in the order in which they were granted, and the Fair Market Value of Shares is determined as of the time the option with respect to such Shares is granted. If the Code is amended to provide for a different limitation from that set forth in this Section 2.2, such different limitation shall be deemed incorporated herein effective as of the date required or permitted by such amendment to the Code. If the Option is treated as an Incentive Stock Option in part and as a Nonstatutory Stock Option in part by reason of the limitation set forth in this Section 2.2, the Participant may designate which portion of such Option the Participant is exercising. In the absence of such designation, the Participant shall be deemed to have exercised the Incentive Stock Option portion of the Option first. Separate certificates representing each such portion shall be issued upon the exercise of the Option. (NOTE TO PARTICIPANT: If the aggregate Exercise Price of the Option (that is, the Exercise Price multiplied by the Number of Option Shares) plus the aggregate exercise price of any other Incentive Stock Options you hold (whether granted pursuant to the Plan or any other stock option plan of the Participating Company Group) is greater than $100,000, you should contact the Chief Financial Officer of the Company to ascertain whether the entire Option qualifies as an Incentive Stock Option.)

## 3. <u>ADMINISTRATION</u>.

All questions of interpretation concerning the Grant Notice, this Option Agreement, the Plan or any other form of agreement or other document employed by the Company in the administration of the Plan or the Option shall be determined by the Board. All such determinations by the Board shall be final, binding and conclusive upon all persons having an interest in the Option, unless fraudulent or made in bad faith. Any and all actions, decisions and determinations taken or made by the Board in the exercise of its discretion pursuant to the Plan or the Option or other agreement thereunder (other than determining questions of interpretation

pursuant to the preceding sentence) shall be final, binding and conclusive upon all persons having an interest in the Option. Any Officer shall have the authority to act on behalf of the Company with respect to any matter, right, obligation, or election which is the responsibility of or which is allocated to the Company herein, provided the Officer has apparent authority with respect to such matter, right, obligation, or election.

## 4. EXERCISE OF THE OPTION.

**4.1. Right to Exercise – Immediate Exercise.** Except as otherwise provided herein, the Option shall be exercisable on and after the Date of Grant and prior to the termination of the Option (as provided in Section 6). In no event shall the Option be exercisable for more shares than the Number of Option Shares, as adjusted pursuant to Section 4.2 of the Plan.

**4.2. Method of Exercise.** Exercise of the Option shall be by means of electronic or written notice (the "***Exercise Notice***") in a form authorized by the Company. An electronic Exercise Notice must be digitally signed or authenticated by the Participant in such manner as required by the notice and transmitted to the Company or an authorized representative of the Company (including a third-party administrator designated by the Company). In the event that the Participant is not authorized or is unable to provide an electronic Exercise Notice, the Option shall be exercised by a written Exercise Notice addressed to the Company, which shall be signed by the Participant and delivered in person, by certified or registered mail, return receipt requested, by confirmed facsimile transmission, or by such other means as the Company may permit, to the Company, or an authorized representative of the Company (including a third-party administrator designated by the Company). Each Exercise Notice, whether electronic or written, must state the Participant's election to exercise the Option, the number of whole Shares for which the Option is being exercised and such other representations and agreements as to the Participant's investment intent with respect to such shares as may be required pursuant to the provisions of this Option Agreement. Further, each Exercise Notice must be received by the Company prior to the termination of the Option as set forth in Section 6 and must be accompanied by full payment of the aggregate Exercise Price for the number of Shares being purchased. The Option shall be deemed to be exercised upon receipt by the Company of such electronic or written Exercise Notice and the aggregate Exercise Price.

**4.3. Payment of Exercise Price.**

**a.** ***Forms of Consideration Authorized.*** Except as otherwise provided below, payment of the aggregate Exercise Price for the number of Shares for which the Option is being exercised shall be made (i) in cash or by check or cash equivalent, (ii) if permitted by the Company, by tender to the Company, or attestation to the ownership, of whole Shares owned by the Participant having a Fair Market Value not less than the aggregate Exercise Price, (iii) by means of a Cashless Exercise, as defined in Section 4.3(b), or (iv) by any combination of the foregoing.

**b. *Limitations on Forms of Consideration.***

**i.   Tender of Shares.**   Notwithstanding the foregoing, the Option may not be exercised by tender to the Company, or attestation to the ownership, of Shares to the extent such tender or attestation would constitute a violation of the provisions of any law, regulation or agreement restricting the redemption of the Company's Shares.   If required by the Company, the Option may not be exercised by tender to the Company, or attestation to the ownership, of Shares unless such shares either have been owned by the Participant for more than six (6) months or such other period, if any, required by the Company (and not used for another option exercise by attestation during such period) or were not acquired, directly or indirectly, from the Company.

**ii.   Cashless Exercise.**   A "*Cashless Exercise*" means the delivery of a properly executed notice together with irrevocable instructions to a broker in a form acceptable to the Company providing for the assignment to the Company of the proceeds of a sale or loan with respect to some or all of the Shares acquired upon the exercise of the Option pursuant to a program or procedure approved by the Company (including, without limitation, through an exercise complying with the provisions of Regulation T as promulgated from time to time by the Board of Governors of the Federal Reserve System).   The Company reserves, at any and all times, the right, in the Company's sole and absolute discretion, to establish, decline to approve, or terminate any such program or procedure, including with respect to the Participant notwithstanding that such program or procedures may be available to others.

**4.4. Tax Withholding**.

**a.   *In General.***   At the time the Award Agreement is executed, or at any time thereafter as requested by the Company, the Participant hereby authorizes withholding from payroll and any other amounts payable to the Participant, and otherwise agrees to make adequate provision for, any sums required to satisfy the federal, state, local and foreign tax withholding obligations of the Company, if any, which arise in connection with the grant, vesting or exercise of the Option or the issuance of Shares in settlement thereof.   The Company shall have no obligation to deliver Shares until the tax obligations of the Company have been satisfied by the Participant.

**b.   *Withholding in Securities.***   The Company may, in its discretion, permit or require the Participant to satisfy all or any portion of the tax obligations by deducting from the Shares otherwise deliverable to the Participant in settlement of the Option a number of Shares having a fair market value, as determined by the Company as of the date on which the tax obligations arise, not in excess of the amount of such tax obligations determined by the applicable withholding rates.   In the event that the Company determines that the tax obligations will not be satisfied by the method described above, Participant authorizes the designated plan administrator or any successor plan administrator, to sell a number of Shares that are purchased under the Option, which the Company determines is sufficient to generate an amount that meets the tax obligations plus additional Shares, as necessary. To account for rounding and market fluctuation, and to pay such tax withholding amounts to the Company.   The Shares may be sold as part of a block trade with other Participants of the Plan in which all Participants receive an average price.   Any adverse consequences to the Participant resulting from the procedure

4

permitted under this Section 4.4, including, without limitation, tax consequences, shall be the sole responsibility of the Participant.

      **c.**      ***Consultation***.  The Participant hereby acknowledges that he or she understands that the Participant may suffer adverse tax consequences as a result of the Participant's exercise of the Option or disposition of the Shares.  The Participant hereby represents that the Participant has consulted with any tax consultants the Participant deems advisable in connection with the exercise of the Option or disposition of the Shares and that the Participant is not relying on the Company for any tax advice.

    **4.5. Beneficial Ownership of Shares; Certificate Registration.**  The Participant hereby authorizes the Company, in its sole discretion, to deposit for the benefit of the Participant with any broker with which the Participant has an account relationship of which the Company has notice any or all shares acquired by the Participant pursuant to the exercise of the Option. Except as provided by the preceding sentence, a certificate for the shares as to which the Option is exercised shall be registered in the name of the Participant, or, if applicable, in the names of the heirs of the Participant.

    **4.6. Restrictions on Grant of the Option and Issuance of Shares.**  The grant of the Option and the issuance of Shares upon exercise of the Option shall be subject to compliance with all applicable requirements of federal, state or foreign law with respect to such securities.  The Option may not be exercised if the issuance of Shares upon exercise would constitute a violation of any applicable federal, state or foreign securities laws or other law or regulations or the requirements of any stock exchange or market system upon which the Shares may then be listed. In addition, the Option may not be exercised unless (i) a registration statement under the Securities Act shall at the time of exercise of the Option be in effect with respect to the shares issuable upon exercise of the Option or (ii) in the opinion of legal counsel to the Company, the shares issuable upon exercise of the Option may be issued in accordance with the terms of an applicable exemption from the registration requirements of the Securities Act.  THE PARTICIPANT IS CAUTIONED THAT THE OPTION MAY NOT BE EXERCISED UNLESS THE FOREGOING CONDITIONS ARE SATISFIED.  ACCORDINGLY, THE PARTICIPANT MAY NOT BE ABLE TO EXERCISE THE OPTION WHEN DESIRED EVEN THOUGH THE OPTION IS VESTED.  The inability of the Company to obtain from any regulatory body having jurisdiction the authority, if any, deemed by the Company's legal counsel to be necessary to the lawful issuance and sale of any shares subject to the Option shall relieve the Company of any liability in respect of the failure to issue or sell such shares as to which such requisite authority shall not have been obtained.  As a condition to the exercise of the Option, the Company may require the Participant to satisfy any qualifications that may be necessary or appropriate, to evidence compliance with any applicable law or regulation and to make any representation or warranty with respect thereto as may be requested by the Company.

    **4.7. Fractional Shares.**  The Company shall not be required to issue fractional shares upon the exercise of the Option.

5.  **NONTRANSFERABILITY OF THE OPTION.**

During the lifetime of the Participant, the Option shall be exercisable only by the Participant or the Participant's guardian or legal representative.  The Option shall not be subject in any manner to anticipation, alienation, sale, exchange, transfer, assignment, pledge, encumbrance, or garnishment by creditors of the Participant or the Participant's beneficiary, except transfer by will or by the laws of descent and distribution.  Following the death of the Participant, the Option, to the extent provided in Section 7, may be exercised by the Participant's legal representative or by any person empowered to do so under the deceased Participant's will or under the then applicable laws of descent and distribution.

6.  **TERMINATION OF THE OPTION.**

The Option shall terminate and may no longer be exercised after the first to occur of (a) the close of business on the Option Expiration Date, (b) the close of business on the last date for exercising the Option following termination of the Participant's Service as described in Section 7 below, or (c) a Change in Control to the extent provided in Section 9 of the Plan.

7.  **EFFECT OF TERMINATION OF SERVICE.**

**7.1. Option Exercisability.**  The Option shall terminate immediately upon the Participant's termination of Service to the extent that it is then unvested and shall be exercisable after the Participant's termination of Service to the extent it is then vested only during the applicable time period as determined below and thereafter shall terminate.

**a.**  *Disability.*  If the Participant's Service terminates because of the Disability of the Participant, the Option, to the extent unexercised and exercisable for Vested Shares on the date on which the Participant's Service terminated, may be exercised by the Participant (or the Participant's guardian or legal representative) at any time prior to the expiration of twelve (12) months after the date on which the Participant's Service terminated, but in any event no later than the Option Expiration Date.

**b.**  *Death.*  If the Participant's Service terminates because of the death of the Participant, the Option, to the extent unexercised and exercisable for Vested Shares on the date on which the Participant's Service terminated, may be exercised by the Participant's legal representative or other person who acquired the right to exercise the Option by reason of the Participant's death at any time prior to the expiration of twenty four (24) months after the date on which the Participant's Service terminated, but in any event no later than the Option Expiration Date.  The Participant's Service shall be deemed to have terminated on account of death if the Participant dies within three (3) months after the Participant's termination of Service.

**c.**  *Termination for Cause.*  Notwithstanding any other provision of this Option Agreement, if the Participant's Service is terminated for Cause, the Option shall terminate and cease to be exercisable ninety (90) days after such termination of Service for Cause.

**d.**  *Other Termination of Service.*  If the Participant's Service terminates for any reason, except Disability, death or Cause, the Option, to the extent unexercised and

exercisable for Vested Shares by the Participant on the date on which the Participant's Service terminated, may be exercised by the Participant at any time prior to the expiration of two (2) years after the date on which the Participant's Service terminated, but in any event no later than the Option Expiration Date.

**7.2. Extension if Exercise Prevented by Law.** Notwithstanding the foregoing other than termination of Service for Cause, if the exercise of the Option within the applicable time periods set forth in Section 7.1 is prevented by the provisions of Section 4.6, the Option shall remain exercisable until the later of (a) thirty (30) days after the date such exercise first would no longer be prevented by such provisions or (b) the end of the applicable time period under Section 7.1, but in any event no later than the Option Expiration Date.

8. **RIGHTS AS A SHAREHOLDER, DIRECTOR, EMPLOYEE OR CONSULTANT.**

The Participant shall have no rights as a shareholder with respect to any shares covered by the Option until the date of the issuance of the shares for which the Option has been exercised (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company). No adjustment shall be made for dividends, distributions or other rights for which the record date is prior to the date the shares are issued, except as provided in Section 4.2 of the Plan. If the Participant is an Employee, the Participant understands and acknowledges that, except as otherwise provided in a separate, written employment agreement between a Participating Company and the Participant, the Participant's employment is "at will" and is for no specified term. Nothing in this Option Agreement shall confer upon the Participant any right to continue in the Service of a Participating Company or interfere in any way with any right of the Participating Company Group to terminate the Participant's Service as a Director, an Employee or Consultant, as the case may be, at any time.

9. **RIGHT OF FIRST REFUSAL.**

**9.1. Grant of Right of First Refusal.** Except as provided in Section 9.7 and Section 14 below, in the event the Participant, the Participant's legal representative, or other holder of shares acquired upon exercise of the Option proposes to sell, exchange, transfer, pledge, or otherwise dispose of any Vested Shares (the "***Transfer Shares***") to any person or entity, including, without limitation, any shareholder of a Participating Company, the Company shall have the right to repurchase the Transfer Shares under the terms and subject to the conditions set forth in this Section 9 (the "***Right of First Refusal***").

**9.2. Notice of Proposed Transfer.** Prior to any proposed transfer of the Transfer Shares, the Participant shall deliver written notice (the "***Transfer Notice***") to the Company describing fully the proposed transfer, including the number of Transfer Shares, the name and address of the proposed transferee (the "***Proposed Transferee***") and, if the transfer is voluntary, the proposed transfer price, and containing such information necessary to show the bona fide nature of the proposed transfer. In the event of a bona fide gift or involuntary transfer, the proposed transfer price shall be deemed to be the Fair Market Value of the Transfer Shares, as determined by the Board in good faith. If the Participant proposes to transfer any Transfer Shares to more than one Proposed Transferee, the Participant shall provide a separate Transfer Notice for the proposed transfer to each Proposed Transferee. The Transfer Notice shall be signed by both the

DocuSign Envelope ID: EE7284F6-8E05-437F-89CB-CCEBC56CDE42

Participant and the Proposed Transferee and must constitute a binding commitment of the Participant and the Proposed Transferee for the transfer of the Transfer Shares to the Proposed Transferee subject only to the Right of First Refusal.

**9.3.    Bona Fide Transfer.**  If the Company determines that the information provided by the Participant in the Transfer Notice is insufficient to establish the bona fide nature of a proposed voluntary transfer, the Company shall give the Participant written notice of the Participant's failure to comply with the procedure described in this Section 9, and the Participant shall have no right to transfer the Transfer Shares without first complying with the procedure described in this Section 9.  The Participant shall not be permitted to transfer the Transfer Shares if the proposed transfer is not bona fide.

**9.4.    Exercise of Right of First Refusal.**  If the Company determines the proposed transfer to be bona fide, the Company shall have the right to purchase all, but not less than all, of the Transfer Shares (except as the Company and the Participant otherwise agree) at the purchase price and on the terms set forth in the Transfer Notice by delivery to the Participant of a notice of exercise of the Right of First Refusal within thirty (30) days after the date the Transfer Notice is delivered to the Company.  The Company's exercise or failure to exercise the Right of First Refusal with respect to any proposed transfer described in a Transfer Notice shall not affect the Company's right to exercise the Right of First Refusal with respect to any proposed transfer described in any other Transfer Notice, whether or not such other Transfer Notice is issued by the Participant or issued by a person other than the Participant with respect to a proposed transfer to the same Proposed Transferee.  If the Company exercises the Right of First Refusal, the Company and the Participant shall thereupon consummate the sale of the Transfer Shares to the Company on the terms set forth in the Transfer Notice within sixty (60) days after the date the Transfer Notice is delivered to the Company (unless a longer period is offered by the Proposed Transferee); provided, however, that in the event the Transfer Notice provides for the payment for the Transfer Shares other than in cash, the Company shall have the option of paying for the Transfer Shares by the present value cash equivalent of the consideration described in the Transfer Notice as reasonably determined by the Company.  For purposes of the foregoing, cancellation of any indebtedness of the Participant to any Participating Company shall be treated as payment to the Participant in cash to the extent of the unpaid principal and any accrued interest canceled.

**9.5.    Failure to Exercise Right of First Refusal.**  If the Company fails to exercise the Right of First Refusal in full (or to such lesser extent as the Company and the Participant otherwise agree) within the period specified in Section 9.4 above, the Participant may conclude a transfer to the Proposed Transferee of the Transfer Shares on the terms and conditions described in the Transfer Notice, provided such transfer occurs not later than ninety (90) days following delivery to the Company of the Transfer Notice.  The Company shall have the right to demand further assurances from the Participant and the Proposed Transferee (in a form satisfactory to the Company) that the transfer of the Transfer Shares was actually carried out on the terms and conditions described in the Transfer Notice.  No Transfer Shares shall be transferred on the books of the Company until the Company has received such assurances, if so demanded, and has approved the proposed transfer as bona fide.  Any proposed transfer on terms and conditions different from those described in the Transfer Notice, as well as any subsequent proposed transfer by the Participant, shall again be subject to the Right of First Refusal and shall require

compliance by the Participant with the procedure described in this Section 9.

**9.6. Transferees of Transfer Shares.** All transferees of the Transfer Shares or any interest therein, other than the Company, shall be required as a condition of such transfer to agree in writing (in a form satisfactory to the Company) that such transferee shall receive and hold such Transfer Shares or interest therein subject to all of the terms and conditions of this Option Agreement, including this Section 9 providing for the Right of First Refusal with respect to any subsequent transfer. Any sale or transfer of any shares acquired upon exercise of the Option shall be void unless the provisions of this Section 9 are met.

**9.7. Transfers Not Subject to Right of First Refusal.** The Right of First Refusal shall not apply to any transfer or exchange of the shares acquired upon exercise of the Option if such transfer or exchange is in connection with an Ownership Change Event. If the consideration received pursuant to such transfer or exchange consists of stock of a Participating Company, such consideration shall remain subject to the Right of First Refusal unless the provisions of Section 9.9 below result in a termination of the Right of First Refusal.

**9.8. Assignment of Right of First Refusal.** The Company shall have the right to assign the Right of First Refusal at any time, whether or not there has been an attempted transfer, to one or more persons as may be selected by the Company.

**9.9. Early Termination of Right of First Refusal.** The other provisions of this Option Agreement notwithstanding, the Right of First Refusal shall terminate and be of no further force and effect upon (a) the occurrence of a Change in Control, unless the Acquiror assumes the Company's rights and obligations under the Option or substitutes a substantially equivalent option for the Acquiror's stock for the Option, or (b) the existence of a public market for the class of shares subject to the Right of First Refusal. A "***public market***" shall be deemed to exist if (i) such stock is listed on a national securities exchange (as that term is used in the Exchange Act) or (ii) such stock is traded on the over the counter market and prices therefor are published daily on business days in a recognized financial journal.

**10. SHARE DISTRIBUTIONS SUBJECT TO OPTION AGREEMENT.**

If, from time to time, there is any stock dividend, stock split or other change, as described in Section 9, in the character or amount of any of the outstanding Shares of the Company subject to the provisions of this Option Agreement, then in such event any and all new, substituted or additional securities to which the Participant is entitled by reason of the Participant's ownership of the shares acquired upon exercise of the Option shall be immediately subject to the Right of First Refusal with the same force and effect as the shares subject to the Right of First Refusal immediately before such event.

**11. NOTICE OF SALES UPON DISQUALIFYING DISPOSITION.**

The Participant shall dispose of the shares acquired pursuant to the Option only in accordance with the provisions of this Option Agreement. In addition, *if the Grant Notice designates this Option as an Incentive Stock Option*, the Participant shall (a) promptly notify the stock plan administrator for the Company if the Participant disposes of any of the shares acquired pursuant to the Option within one (1) year after the date the Participant exercises all or

part of the Option or within two (2) years after the Date of Grant and (b) provide the Company with a description of the circumstances of such disposition. Until such time as the Participant disposes of such shares in a manner consistent with the provisions of this Option Agreement, unless otherwise expressly authorized by the Company, the Participant shall hold all shares acquired pursuant to the Option in the Participant's name (and not in the name of any nominee) for the one-year period immediately after the exercise of the Option and the two-year period immediately after Date of Grant. At any time during the one-year or two-year periods set forth above, the Company may place a legend on any certificate representing shares acquired pursuant to the Option requesting the transfer agent for the Company's Shares to notify the Company of any such transfers. The obligation of the Participant to notify the Company of any such transfer shall continue notwithstanding that a legend has been placed on the certificate pursuant to the preceding sentence.

**12. LEGENDS.**

**12.1.** The Company may at any time place legends referencing the Right of First Refusal and any applicable federal, state or foreign securities law restrictions on all certificates representing Shares subject to the provisions of this Option Agreement. The Participant shall, at the request of the Company, promptly present to the Company any and all certificates representing shares acquired pursuant to the Option in the possession of the Participant in order to carry out the provisions of this Section. Unless otherwise specified by the Company, legends placed on such certificates may include, but shall not be limited to, the following:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 OR RULE 701 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT."

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER, INCLUDING A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE COMPANY OR ITS ASSIGNEE SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDER, OR SUCH HOLDER'S PREDECESSOR IN INTEREST, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THIS COMPANY."

"THE SHARES EVIDENCED BY THIS CERTIFICATE WERE ISSUED BY THE COMPANY TO THE REGISTERED HOLDER UPON EXERCISE OF AN INCENTIVE STOCK OPTION AS DEFINED IN SECTION 422 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED ("ISO"). IN ORDER TO OBTAIN THE PREFERENTIAL TAX TREATMENT AFFORDED TO ISOs, THE SHARES SHOULD NOT BE TRANSFERRED PRIOR TO *[INSERT DISQUALIFYING DISPOSITION DATE HERE]*. SHOULD THE REGISTERED HOLDER ELECT TO TRANSFER ANY OF THE SHARES PRIOR TO THIS

DATE AND FOREGO ISO TAX TREATMENT, THE TRANSFER AGENT FOR THE SHARES SHALL NOTIFY THE COMPANY IMMEDIATELY.   THE REGISTERED HOLDER SHALL HOLD ALL SHARES PURCHASED UNDER THE INCENTIVE STOCK OPTION IN THE REGISTERED HOLDER'S NAME (AND NOT IN THE NAME OF ANY NOMINEE) PRIOR TO THIS DATE OR UNTIL TRANSFERRED AS DESCRIBED ABOVE."

### 13. LOCK-UP AGREEMENT.

The Participant hereby agrees that in the event of any underwritten public offering of stock, including an initial public offering of stock, made by the Company pursuant to an effective registration statement filed under the Securities Act, the Participant shall not offer, sell, contract to sell, pledge, hypothecate, grant any option to purchase or make any short sale of, or otherwise dispose of any Shares of the Company or any rights to acquire stock of the Company for such period of time from and after the effective date of such registration statement as may be established by the underwriter for such public offering.  The foregoing limitation shall not apply to shares registered in the public offering under the Securities Act.  The Participant hereby agrees to enter into any agreement reasonably required by the underwriters to implement the foregoing within a reasonable timeframe if so requested by the Company.

### 14. RESTRICTIONS ON TRANSFER OF SHARES.

**14.1.   Restrictions on Transfer.**  Except as permitted by the Board, at its sole discretion, no shares acquired upon exercise of the Option may be sold, exchanged, transferred (including, without limitation, any transfer to a nominee or agent of the Participant), assigned, pledged, hypothecated or otherwise disposed of, including by operation of law.  The Company shall not be required  to transfer on its books any shares which will have been transferred in violation of any of the provisions set forth in this Option Agreement.

**14.2.   Permitted Transfer Subject to Company's Right of First Refusal.**  In the event that the Board permits the transfer of shares acquired upon exercise of the Option, any transfer of said shares shall be subject to the Company's Right of First Refusal as set forth in Section 9 of this Option Agreement.

**14.3.   Termination of Restrictions on Transfer of Shares.**  The other provisions of this Option Agreement notwithstanding, the Restriction on Transfer of Shares shall terminate and be of no further force and effect upon (a) the occurrence of a Change in Control, unless the Acquiror assumes the Company's rights and obligations under the Option or substitutes a substantially equivalent option for the Acquiror's stock for the Option, or (b) the existence of a public market (as defined in Section 9.9 of this Option Agreement) for the class of shares subject to the Restrictions on the Transfer of Shares.

## 15. MISCELLANEOUS PROVISIONS.

**15.1.  Termination or Amendment.**  The Board may terminate or amend the Plan or the Option at any time; provided, however, that except as provided in Section 8 in connection with a Change in Control, no such termination or amendment may adversely affect the Option or any unexercised portion hereof without the consent of the Participant unless such termination or amendment is necessary to comply with any applicable law or government regulation, including, but not limited to Section 409A of the Code.  No amendment or addition to this Option Agreement shall be effective unless in writing.

**15.2.  Compliance with Section 409A.**  The Company intends that income realized by the Participant pursuant to the Plan and this Option Agreement will not be subject to taxation under Section 409A of the Code.  The provisions of the Plan and this Option Agreement shall be interpreted and construed in favor of satisfying any applicable requirements of Section 409A of the Code.  The Company, in its reasonable discretion, may amend (including retroactively) the Plan and this Agreement in order to conform to the applicable requirements of Section 409A of the Code, including amendments to facilitate the Participant's ability to avoid taxation under Section 409A of the Code.  However, the preceding provisions shall not be construed as a guarantee by the Company of any particular tax result for income realized by the Participant pursuant to the Plan or this Option Agreement.  In any event, and except for the responsibilities of the Company set forth in Section 4.4 above, no Participating Company shall be responsible for the payment of any applicable taxes on income realized by the Participant pursuant to the Plan or this Option Agreement.

**15.3.  Further Instruments.**  The parties hereto agree to execute such further instruments (including, but not limited to, a joinder to the Shareholders Rights Agreement referred to in Section 13.4 of the Plan) and to take such further action as may reasonably be necessary to carry out the intent of this Option Agreement.

**15.4.  Binding Effect.**  Subject to the restrictions on transfer set forth herein, this Option Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, successors and assigns.

**15.5.  Delivery of Documents and Notices.**  Any document relating to participation in the Plan, or any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given (except to the extent that this Option Agreement provides for effectiveness only upon actual receipt of such notice) upon personal delivery electronic delivery at the e-mail address, if any, provided for the Participant by the Participating Company, or, upon deposit in the U.S. Post Office or foreign postal service, by registered or certified mail, or with a nationally recognized overnight courier service with postage and fees prepaid, addressed to the other party at the address of such party set forth in the Grant Notice or at such other address as such party may designate in writing from time to time to the other party.

**a.  Description of Electronic Delivery.**  The Plan documents, which may include but do not necessarily include: the Plan, the Grant Notice, this Option Agreement, and any reports of the Company provided generally to the Company's shareholders, may be delivered to the Participant electronically.  In addition, if permitted by the Company, the Participant may deliver

12

electronically the Grant Notice and Exercise Notice called for by Section 4.2 to the Company or to such third party involved in administering the Plan as the Company may designate from time to time. Such means of electronic delivery may include but do not necessarily include the delivery of a link to a Company intranet or the internet site of a third party involved in administering the Plan, the delivery of the document via e-mail or such other means of electronic delivery specified by the Company.

      **b. Consent to Electronic Delivery.** The Participant acknowledges that the Participant has read Section 15.5(a) of this Option Agreement and consents to the electronic delivery of the Plan documents and, if permitted by the Company, the delivery of the Grant Notice and Exercise Notice, as described in Section 15.5(a). The Participant acknowledges that he or she may receive from the Company a paper copy of any documents delivered electronically at no cost to the Participant by contacting the Company by telephone or in writing. The Participant further acknowledges that the Participant will be provided with a paper copy of any documents if the attempted electronic delivery of such documents fails. Similarly, the Participant understands that the Participant must provide the Company or any designated third party administrator with a paper copy of any documents if the attempted electronic delivery of such documents fails. The Participant may revoke his or her consent to the electronic delivery of documents described in Section 15.5(a) or may change the electronic mail address to which such documents are to be delivered (if Participant has provided an electronic mail address) at any time by notifying the Company of such revoked consent or revised e-mail address by telephone, postal service or electronic mail. Finally, the Participant understands that he or she is not required to consent to electronic delivery of documents described in Section 15.5(a).

      **15.6. Integrated Agreement.** The Grant Notice, this Option Agreement and the Plan, together with any employment, service or other agreement with the Participant and a Participating Company referring to the Option, shall constitute the entire understanding and agreement of the Participant and the Participating Company Group with respect to the subject matter contained herein or therein and supersede any prior agreements, understandings, restrictions, representations, or warranties among the Participant and the Participating Company Group with respect to such subject matter. To the extent contemplated herein or therein, the provisions of the Grant Notice, the Option Agreement and the Plan shall survive any exercise of the Option and shall remain in full force and effect.

      **15.7. Applicable Law.** This Option Agreement shall be governed by the laws of the State of Delaware as such laws are applied to agreements between Delaware residents entered into and to be performed entirely within the State of Delaware.

      **15.8. Counterparts.** The Grant Notice may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

__ Incentive Stock Option
__ Nonstatutory Stock Option

Participant: _____

Date: _____

### STOCK OPTION EXERCISE NOTICE
### (IMMEDIATELY EXERCISABLE OPTION)

OpenSpend, Inc

Attention: _____

_____

_____

Ladies and Gentlemen:

1.        **Option.**  I was granted an option (the *"Option"*) to purchase shares of the common stock (the *"Shares"*) of OpenSpend, Inc (the *"Company"*) pursuant to the Company's Stock Incentive Plan (the *"Plan"*), my Notice of Grant of Stock Option (the *"Grant Notice"*) and my Stock Option Agreement (the *"Option Agreement"*) as follows:

Date of Grant: _____

Number of Option Shares: _____

Exercise Price per Share: $ _____

2.        **Exercise of Option.**  I hereby elect to exercise the Option to purchase the following number of Shares, all of which are Vested Shares, in accordance with the Grant Notice and the Option Agreement:

Total Shares Purchased: _____

Total Exercise Price (Total Shares  X  Price per Share)   $ _____

3.        **Payments.**  I enclose payment in full of the total exercise price for the Shares in the following form(s), as authorized by my Option Agreement:

| | |
|---|---|
| __ Cash: | $ _____ |
| __ Check: | $ _____ |
| __ Tender of Company Shares: | Contact Plan Administrator |

4.        **Tax Withholding.**  I authorize payroll withholding and otherwise will make adequate provision for the federal, state, local and foreign tax withholding obligations of the Company, if any, in connection with the Option.  If I am exercising a Nonstatutory Stock Option, I enclose payment in full of my withholding taxes, if any, as follows:

**(Contact Plan Administrator for amount of tax due.)**

| | |
|---|---|
| __ Cash: | $ _____ |
| __ Check: | $ _____ |

5.        **Participant Information.**

My address is: _____

_____

My Social Security Number is: _____

6.        **Notice of Disqualifying Disposition.**  If the Option is an Incentive Stock Option, I agree that I will promptly notify the Company if I transfer any of the Shares within one (1) year from the date I exercise all or part of the Option or within two (2) years of the Date of Grant.

7.     **Repurchase Rights.**

A.   **Company Repurchase Right – Unvested Option Shares and Termination for Cause**. I hereby agree that if (i) any of the Option shares issued to me are not vested at the time of my termination of Service or (ii) my Service to the Company is terminated for Cause, the Company or its assignee of rights hereunder shall upon the date of the termination (the "***Termination Date***") have an irrevocable right and exclusive option (the "***Repurchase Right***") to repurchase from me, or my personal representative, as the case may be, all or any portion of the exercised Shares  received pursuant to the Agreement at (i) for unvested Option Shares – at the lower of the Exercise Price paid by me or the Fair Market Value on the date the Repurchase Right is exercised; and (ii) for repurchase following termination for Cause - at the Fair Market Value of the Shares on the date the Repurchase Right is exercised (collectively the "***Repurchase Price***").  Subject to this Section 7, the Repurchase Right may be exercised in writing by the Company at any time after the later to occur of (i) the Termination Date and (ii) the six- (6) month anniversary of the date the Shares were acquired by me.

B.   **Payment**.  The Company, at its election, may satisfy its payment obligation to me with respect to exercise of the Repurchase Right by either (i) delivering a check to me in the amount of the aggregate Repurchase Price for the Shares being repurchased, or (ii) in the event that I am indebted to the Company, offsetting the aggregate Repurchase Price for the Shares being repurchased with an amount of such indebtedness equal to the aggregate Repurchase Price for the Shares being repurchased, or (iii) by a combination of (i) and (ii) so that the combined payment and cancellation of indebtedness equals the aggregate Repurchase Price.  At its election, the Company or its assignee of rights hereunder may elect to make payment for the Shares to a bank selected by the Company.  The Company shall avail itself of this election by a notice in writing to me stating the name and address of the bank, date of closing, and waiving the closing at the Company's office.  As a result of any repurchase of Shares pursuant to this Section 7, the Company shall become the legal and beneficial owner of the Shares being repurchased and shall have all rights and interest therein or related thereto to the extent permitted by Applicable Laws and Company's articles of association, and the Company shall have the right to transfer to its own name the number of Shares being repurchased by the Company, without further action by me.

C.   **Change in Control**.  In the event of Change in Control, any Repurchase Right under this Section 7 shall remain in full force and effect and shall apply to the new shares of capital received in exchange for the Shares in consummation of the Change in Control.

D.   **Lapse**.  Notwithstanding any other provision of this Agreement, any Repurchase Right provided in this Section 7 shall terminate as to any Shares upon the earlier to occur of (i) a Qualified Public Offering and (ii) a Change in Control in which the successor corporation has equity securities that are publicly traded.

E.   **Power of Attorney**.  I hereby grant an irrevocable power of attorney to the Company to sell and transfer the Shares in my name to the Company at Fair Market Value, subject to (i) the Company exercising the Repurchase Right, and (ii) the terms and conditions included in this Agreement and the Plan.  In performing acts pursuant to this power of attorney, the Company may act pursuant to a power of attorney granted by one or more other persons involved in the acts referred to in the previous sentence.

F.   **Deposit of Unvested Shares**.  Upon issuance, the certificate for any unvested Shares subject to repurchase rights hereunder shall be deposited in escrow with the Company to be held in accordance with the provisions of this Agreement.  Such deposited certificate shall be accompanied by a duly executed Assignment Separate from Certificate in the form of Exhibit A attached hereto.  The deposited certificate, together with any other assets or securities from time to time deposited with the Company pursuant to the requirements of this Agreement, shall remain in escrow until such time or times as the certificate (or other assets and securities) shall be released or otherwise surrendered for cancellation

8.     **Binding Effect.**  I agree that the Shares are being acquired in accordance with and subject to the terms, provisions and conditions of the Grant Notice, the Option Agreement, including the Right of First Refusal set forth therein, and the Plan, to all of which I hereby expressly assent.  This Agreement shall inure to the benefit of and be binding upon my heirs, executors, administrators, successors and assigns.

9.     **Investment Representation**.  I hereby makes the investment representations listed on **Exhibit B** to the Company as of the date of this Agreement and agree that such representations are incorporated into

this Agreement by this reference, such that the Company may rely on them in issuing the Shares. I understand and acknowledge that the Shares have not been registered under the Securities Act of 1933, as amended (the *"Securities Act"*), and that consequently the Shares must be held indefinitely unless they are subsequently registered under the Securities Act, an exemption from such registration is available, or they are sold in accordance with Rule 144 or Rule 701 under the Securities Act. I further understand and acknowledge that the Company is under no obligation to register the Shares. I understand that the certificate or certificates evidencing the Shares will be imprinted with legends which prohibit the transfer of the Shares unless they are registered or such registration is not required in the opinion of legal counsel satisfactory to the Company.

10. **SPECIAL TAX ELECTION**. The acquisition of Shares may result in adverse tax consequences which may be avoided or mitigated by filing an election under Code Section 83(b). Such election must be filed within thirty (30) days after the date of this Agreement. A description of the tax consequences applicable to the acquisition of the Purchased Shares and the form for making the Code Section 83(b) election are attached hereto. **PARTICIPANT SHOULD CONSULT WITH HIS OR HER TAX ADVISOR TO DETERMINE THE TAX CONSEQUENCES OF ACQUIRING THE PURCHASED SHARES AND THE ADVANTAGES AND DISADVANTAGES OF FILING THE CODE SECTION 83(b) ELECTION. PARTICIPANT ACKNOWLEDGES THAT IT IS PARTICIPANT'S SOLE RESPONSIBILITY, AND NOT THE COMPANY'S, TO FILE A TIMELY ELECTION UNDER CODE SECTION 83(b), EVEN IF PARTICIPANT REQUESTS THE COMPANY OR ITS REPRESENTATIVES TO MAKE THIS FILING ON HIS OR HER BEHALF. SEE** <u>**EXHIBIT C**</u> **FOR CODE SECTION 83(b) FORMS.**

I am aware that Rule 144 under the Securities Act, which permits limited public resale of securities acquired in a nonpublic offering, is not currently available with respect to the Shares and, in any event, is available only if certain conditions are satisfied. I understand that any sale of the Shares that might be made in reliance upon Rule 144 may only be made in limited amounts in accordance with the terms and conditions of such rule and that a copy of Rule 144 will be delivered to me upon request.

I understand that I am purchasing the Shares pursuant to the terms of the Plan, the Grant Notice and my Option Agreement, copies of which I have received and carefully read and understand.

Participant: _____
          (Signature)

\* \* \* \* \*

I, _____, spouse of Participant, have read and hereby approve the foregoing Agreement. In consideration of the Company's granting my spouse the right to purchase the Shares as set forth in the Agreement, I hereby agree to be bound irrevocably by the Agreement and further agree that any community property or other such interest that I may have in the Shares shall hereby be similarly bound by the Agreement. I hereby appoint my spouse as my attorney-in-fact with respect to any amendment or exercise of any rights under the Agreement.

_____
Spouse Signature
Date: _____

Receipt of the above is hereby acknowledged.
OpenSpend, Inc

By: _____
Title: _____
Dated: _____

## EXHIBIT A

## STOCK POWER AND ASSIGNMENT
## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Stock Option Exercise Notice dated as of _____, 2016 the undersigned hereby sells, assigns and transfers unto _____, _____ (_____) shares of common stock of OpenSpend, Inc, a Delaware corporation (the "Company"), standing in the undersigned's name on the books of said Company represented by certificate number _____ delivered herewith, and does hereby irrevocably constitute and appoint the Company (and each of its officers)  as attorney-in-fact, with full power of substitution, to transfer said stock on the books of said Company.

Dated: _____

_____
(*Signature*)

_____
(*Print Name*)

_____
(*Spouse's Signature, if any*)

_____
(*Print Name*)

This Assignment Separate From Certificate was executed in conjunction with the terms of a Stock Option  Agreement between the above assignor and the above Company, dated as of _____ ____, 2016.

**Instruction: Please do not fill in any blanks other than the signature and name lines.**

**EXHIBIT B**

**INVESTMENT REPRESENTATION STATEMENT**

PURCHASER     :     _____

COMPANY     :     OpenSpend, Inc

SECURITY     :     Common Stock

AMOUNT     :     _____ Shares

DATE     :

---

In connection with the purchase of the above-listed shares, I, the undersigned purchaser, represent to the Company as follows:

1.   *The Company may rely on these representations*. I understand that the Company's sale of the shares to me has not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), because the Company believes, relying in part on my representations in this document, that an exemption from such registration requirement is available for such sale. I understand that the availability of this exemption depends upon the representations I am making to the Company in this document being true and correct.

2.   *I am purchasing for investment*. I am purchasing the shares solely for investment purposes, and not for further distribution. My entire legal and beneficial ownership interest in the shares is being purchased and shall be held solely for my account, except to the extent I intend to hold the shares jointly with my spouse. I am not a party to, and do not presently intend to enter into, any contract or other arrangement with any other person or entity involving the resale, transfer, grant of participation with respect to or other distribution of any of the shares. My investment intent is not limited to my present intention to hold the shares for the minimum capital gains period specified under any applicable tax law, for a deferred sale, for a specified increase or decrease in the market price of the shares, or for any other fixed period in the future.

3.   *I can protect my own interests*. I can properly evaluate the merits and risks of an investment in the shares and can protect my own interests in this regard, whether by reason of my own business and financial expertise, the business and financial expertise of certain professional advisors unaffiliated with the Company with whom I have consulted, or my preexisting business or personal relationship with the Company or any of its officers, directors or controlling persons.

4.   *I am informed about the Company*. I am sufficiently aware of the Company's business affairs and financial condition to reach an informed and knowledgeable decision to acquire the shares. I have had opportunity to discuss the plans, operations and financial condition of the Company with its officers, directors or controlling persons, and have received all information I deem appropriate for assessing the risk of an investment in the shares.

5.   *I recognize my economic risk*. I realize that the purchase of the shares involves a high degree of risk, and that the Company's future prospects are uncertain. I am able to hold the shares indefinitely if required, and am able to bear the loss of my entire investment in the shares.

6.   *I know that the shares are restricted securities*. I understand that the shares are "restricted securities" in that the Company's sale of the shares to me has not been registered under the Securities Act in reliance upon an exemption for non-public offerings. In this regard, I also understand and agree that:

A.     I must hold the shares indefinitely, unless any subsequent proposed resale by me is registered under the Securities Act, or unless an exemption from registration is otherwise available (such as Rule 144);

B.     the Company is under no obligation to register any subsequent proposed resale of the shares by me; *and*

C.     the certificate evidencing the shares will be imprinted with a legend which prohibits the transfer of the shares unless such transfer is registered or such registration is not required in the opinion of counsel for the Company.

7.   *I am familiar with Rule 144*. I am familiar with Rule 144 adopted under the Securities Act, which in some circumstances permits limited public resales of "restricted securities" like the shares acquired from an issuer in a non-public offering. I understand that my ability to sell the shares under Rule 144 in the future is uncertain, and will depend upon, among other things: (i) the availability of certain current public information about the Company; (ii) the resale occurring more than one year after my purchase and full payment (within the meaning of Rule 144) for the shares; and (iii) if I am an affiliate of the Company, or a non-affiliate who has held the shares less than one years after my purchase and full payment: (A) the sale being made through a broker in an unsolicited "broker's transaction" or in transactions directly with a market maker, as said term is defined under the Securities Exchange Act of 1934, as amended, (B) the amount of shares being sold during any three-month period not exceeding the specified limitations stated in Rule 144, and (C) timely filing of a notice of proposed sale on Form 144, if applicable.

8.   *I know that Rule 144 may never be available*. I understand that the requirements of Rule 144 may never be met, and that the shares may never be saleable. I further understand that at the time I wish to sell the shares, there may be no public market for the Company's Shares upon which to make such a sale, or the current public information requirements of Rule 144 may not be satisfied, either of which would preclude me from selling the shares under Rule 144 even if the one-year minimum holding period had been satisfied.

9.   *I know that I am subject to further restrictions on resale*. I understand that in the event Rule 144 is not available to me, any future proposed sale of any of the shares by me will not be possible without prior registration under the Securities Act, compliance with some other registration exemption (which may or may not be available), or *each* of the following: (i) my written notice to the Company containing detailed information regarding the proposed sale, (ii) my providing an opinion of my counsel to the effect that such sale will not require registration, and (iii) the Company notifying me in writing that its counsel concurs in such opinion. I understand that neither the Company nor its counsel is obligated to provide me with any such opinion. I understand that although Rule 144 is not exclusive, the Staff of the SEC has stated that persons proposing to sell private placement securities other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

10.   *I know that I may have tax liability due to the uncertain value of the shares*. I understand that the Board of Directors believes its valuation of the shares represents a fair appraisal of their worth, but that it remains possible that, with the benefit of hindsight, the Internal Revenue Service may successfully

assert that the value of the shares on the date of my purchase is substantially greater than the Board's appraisal. I understand that any additional value ascribed to the shares by such an IRS determination will constitute ordinary income to me as of the purchase date, and that any additional taxes and interest due as a result will be my sole responsibility payable only by me, and that the Company need not and will not reimburse me for that tax liability. I understand that if such additional value represents more than 25% of my gross income for the year in which the value of the shares is taxable, the IRS will have 6 years from the due date for filing the return (or the actual filing date of the return if filed thereafter) within which to assess me the additional tax and interest due.

11. *Residence*. The address of my principal residence is set forth on the signature page below.

By signing below, I acknowledge my agreement with each of the statements contained in this Investment Representation Statement as of the date first set forth above, and my intent for the Company to rely on such statements in issuing the shares to me.

_____

*Purchaser's Signature*

Address of Purchaser's Principal Residence:

_____

_____

**EXHIBIT C**
**ELECTION UNDER SECTION 83(b) OF THE**
**INTERNAL REVENUE CODE OF 1986, AS AMENDED**

Internal Revenue Service

_____

_____

IRS Service Center where Form 1040 is Filed

**Re:      Section 83(b) Election**

The following information is submitted pursuant to section 1.83-2 of the Treasury Regulations in connection with this election by the undersigned under section 83(b) of the Internal Revenue Code of 1986, as amended (the "Code").

1.      Taxpayer  Name: _____
         Address: _____
         _____
         Social Security Number:_____

2.      Description of property for which the election is made:
         _____ shares of common stock of OpenSpend, Inc (the "Shares"), received from the OpenSpend, Inc (the "Company") pursuant to a stock option award.

3.      The property was transferred to the undersigned on:_____ (Date).

4.      The taxable year for which the election is made is ____ (Current Tax Year).

5.      The nature of the restriction:  The Shares are subject to repurchase by the Company or its assignee upon the occurrence of certain events.  This repurchase right lapses with regard to a portion of the Shares based upon the continued performance of services by the taxpayer over time.

6.      Fair market value of the Shares at the time of transfer:  $_____ (_____ Shares at $_____ per share).

7.      Amount paid for the Shares:  $____.

8.      A copy of this election has been furnished to OpenSpend, Inc, the company for which the services were performed by the undersigned.

Please acknowledge receipt of this election by date or received-stamping the enclosed copy of this letter and returning it to the undersigned.  A self-addressed stamped envelope is provided for your convenience.

Taxpayer

_____            Date: _____

Spouse of Taxpayer

_____            Date: _____

_____

# EXHIBIT B

# OPENSPEND, INC
# NOTICE OF GRANT OF STOCK OPTION
# (IMMEDIATELY EXERCISABLE)

The Participant has been granted an option (the *"Option"*) to purchase certain shares of OpenSpend, Inc (the "***Company***") pursuant to the OpenSpend, Inc Stock Incentive Plan (the *"**Plan**"*), as follows:

| | |
|---|---|
| **Participant:** | Tom McKeever |
| **Date of Grant:** | October 24, 2016 |
| **Number of Option Shares:** | 288,470 |
| **Exercise Price:** | $0.09 |
| **Initial Vesting Date:** | October 15, 2016 |
| **Option Expiration Date:** | The date 10 years after the Date of Grant |
| **Tax Status of Option:** | NONSTATUTORY STOCK OPTION |
| **Vested Shares:** | Except as provided in the Award Agreement, the number of Vested Shares (disregarding any resulting fractional share) as of any date is determined by multiplying the Number of Option Shares by the *"Vested Ratio"* determined as of such date as follows: |

| | Vested Ratio |
|---|---|
| On Initial Vesting Date, provided the Participant's Service has not terminated prior to such date <u>Plus</u> | 1/16 |
| For each additional three months of the Participant's continuous Service from Initial Vesting Date until the Vested Ratio equals 1/1, an additional | 1/16 |

Capitalized terms not defined herein shall have the meaning as set forth in the Stock Incentive Plan.

Notwithstanding the vesting schedule described above, nor any terms of the Stock Option Agreement and/or Plan, in the event a Change in Control occurs, and within 18 months of the Change in Control, Participant's Service either is terminated by the Company without Cause or Participant terminates his or her Service due to Company action that results in a material diminution in Participant's position, duties, responsibilities or compensation without Participant's consent, except in connection with termination of Service for Cause, 100% of the unvested portion of this Option shall become immediately vested.

Except as provided in the immediately preceding paragraph, upon termination of Participant's Service, any portion of the Option that is not vested and exercisable as of such date of termination shall automatically expire in accordance with the Award Agreement.

The Exercise Price represents an amount the Company believes to be no less than the fair market value of a Share as of the Date of Grant, determined in good faith in compliance with the requirements of Section 409A of the Code. However, there is no guarantee that the Internal Revenue Service will agree with the Company's determination. A subsequent IRS determination that the Exercise Price is less than such fair market value could result in adverse tax consequences to the Participant. By signing below, the Participant agrees that the Company, its Directors, Officers and shareholders shall not be held liable for any tax, penalty, interest or cost incurred by the Participant as a result of such determination by the IRS. The Participant is urged to consult with his or her own tax advisor regarding the tax consequences of the Option, including the application of Section 409A.

**REPURCHASE RIGHTS - PARTICIPANT HEREBY AGREES THAT ALL OPTION SHARES ACQUIRED UPON THE EXERCISE OF THE OPTION SHALL BE SUBJECT TO CERTAIN REPURCHASE RIGHTS AND RIGHTS OF FIRST REFUSAL EXERCISABLE BY THE COMPANY AND ITS ASSIGNS. THE TERMS OF SUCH RIGHTS ARE SPECIFIED IN THE ATTACHED OPTION EXERCISE AGREEMENT.**

By their signatures below, the Company and the Participant agree that the Option is governed by this Grant Notice and by the provisions of the Plan and the Award Agreement, both of which are attached to and made a part of this document. The Participant acknowledges receipt of copies of the Plan and the Award Agreement, represents that the Participant has read and is familiar with their provisions, and hereby accepts the Option subject to all of their terms and conditions.

OPENSPEND, INC

By: _Sean Maney_
472223512A0P487...

Its: President

Address:

PARTICIPANT
Thomas McKeever

Signature _Thomas Mckeever_
3D79A7017B2B475...

Date 10/28/2016

Address 2250 North Point #7, SF, CA 94123

ATTACHMENTS: OpenSpend, Inc Stock Incentive Plan, as amended to the Date of Grant; Award Agreement and Exercise Notice

[CALIFORNIA ONLY] THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAVE NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102, OR 25105 OF THE CALIFORNIA CORPORATIONS CODE.  THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH SALE OR DISPOSITION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

# OPENSPEND, INC
# STOCK OPTION AWARD AGREEMENT
# (IMMEDIATELY EXERCISABLE)

OpenSpend, Inc has granted to the Participant named in the *Notice of Grant of Stock Option* (the "***Grant Notice***") to which this Award Agreement is attached an Option to purchase certain Shares upon the terms and conditions set forth in the Grant Notice and this Award Agreement. The Option has been granted pursuant to and shall in all respects be subject to the terms and conditions of the OpenSpend, Inc Stock Incentive Plan (the "***Plan***"), as amended to the Date of Grant, the provisions of which are incorporated herein by reference.  By signing the Grant Notice, the Participant: (a) acknowledges receipt of, and represents that the Participant has read and is familiar with the terms and conditions of, the Grant Notice, this Award Agreement and the Plan, (b) accepts the Option subject to all of the terms and conditions of the Grant Notice, this Award Agreement and the Plan, and (c) agrees to accept as binding, conclusive and final all decisions or interpretations of the Board upon any questions arising under the Grant Notice, this Award Agreement or the Plan.

1. **DEFINITIONS AND CONSTRUCTION.**

    **1.1.    Definitions.**   Unless otherwise defined herein, capitalized terms shall have the meanings assigned to such terms in the Grant Notice or the Plan.

    **1.2.    Construction.**  Captions and titles contained herein are for convenience only and shall not affect the meaning or interpretation of any provision of this Option Agreement.  Except when otherwise indicated by the context, the singular shall include the plural and the plural shall include the singular.  Use of the term "or" is not intended to be exclusive, unless the context clearly requires otherwise.

2. **TAX CONSEQUENCES.**

    **2.1.    Tax Status of Option.**  This Option is intended to have the tax status designated in the Grant Notice.

**a. Incentive Stock Option.** If the Grant Notice so designates, this Option is intended to be an Incentive Stock Option within the meaning of Section 422(b) of the Code, but the Company does not represent or warrant that this Option qualifies as such. The Participant should consult with the Participant's own tax advisor regarding the tax effects of this Option and the requirements necessary to obtain favorable income tax treatment under Section 422 of the Code, including, but not limited to, holding period requirements. (NOTE TO PARTICIPANT: If the Option is exercised more than three (3) months after the date on which you cease to be an Employee (other than by reason of your death or permanent and total disability as defined in Section 22(e)(3) of the Code), the Option will be treated as a Nonstatutory Stock Option and not as an Incentive Stock Option to the extent required by Section 422 of the Code.)

**b. Nonstatutory Stock Option.** If the Grant Notice so designates, this Option is intended to be a Nonstatutory Stock Option and shall not be treated as an Incentive Stock Option within the meaning of Section 422(b) of the Code.

**2.2. ISO Fair Market Value Limitation.** *If the Grant Notice designates this Option as an Incentive Stock Option*, then to the extent that the Option (together with all Incentive Stock Options granted to the Participant under all stock option plans of the Participating Company Group, including the Plan) becomes exercisable for the first time during any calendar year for shares having a Fair Market Value greater than One Hundred Thousand Dollars ($100,000), the portion of such options which exceeds such amount will be treated as Nonstatutory Stock Options. For purposes of this Section 2.2, options designated as Incentive Stock Options are taken into account in the order in which they were granted, and the Fair Market Value of Shares is determined as of the time the option with respect to such Shares is granted. If the Code is amended to provide for a different limitation from that set forth in this Section 2.2, such different limitation shall be deemed incorporated herein effective as of the date required or permitted by such amendment to the Code. If the Option is treated as an Incentive Stock Option in part and as a Nonstatutory Stock Option in part by reason of the limitation set forth in this Section 2.2, the Participant may designate which portion of such Option the Participant is exercising. In the absence of such designation, the Participant shall be deemed to have exercised the Incentive Stock Option portion of the Option first. Separate certificates representing each such portion shall be issued upon the exercise of the Option. (NOTE TO PARTICIPANT: If the aggregate Exercise Price of the Option (that is, the Exercise Price multiplied by the Number of Option Shares) plus the aggregate exercise price of any other Incentive Stock Options you hold (whether granted pursuant to the Plan or any other stock option plan of the Participating Company Group) is greater than $100,000, you should contact the Chief Financial Officer of the Company to ascertain whether the entire Option qualifies as an Incentive Stock Option.)

**3. ADMINISTRATION.**

All questions of interpretation concerning the Grant Notice, this Option Agreement, the Plan or any other form of agreement or other document employed by the Company in the administration of the Plan or the Option shall be determined by the Board. All such determinations by the Board shall be final, binding and conclusive upon all persons having an interest in the Option, unless fraudulent or made in bad faith. Any and all actions, decisions and determinations taken or made by the Board in the exercise of its discretion pursuant to the Plan or the Option or other agreement thereunder (other than determining questions of interpretation

pursuant to the preceding sentence) shall be final, binding and conclusive upon all persons having an interest in the Option.  Any Officer shall have the authority to act on behalf of the Company with respect to any matter, right, obligation, or election which is the responsibility of or which is allocated to the Company herein, provided the Officer has apparent authority with respect to such matter, right, obligation, or election.

## 4.  EXERCISE OF THE OPTION.

**4.1.    Right to Exercise – Immediate Exercise.**  Except as otherwise provided herein, the Option shall be exercisable on and after the Date of Grant and prior to the termination of the Option (as provided in Section 6).   In no event shall the Option be exercisable for more shares than the Number of Option Shares, as adjusted pursuant to Section 4.2 of the Plan.

**4.2.    Method of Exercise.**  Exercise of the Option shall be by means of electronic or written notice (the "***Exercise Notice***") in a form authorized by the Company.  An electronic Exercise Notice must be digitally signed or authenticated by the Participant in such manner as required by the notice and transmitted to the Company or an authorized representative of the Company (including a third-party administrator designated by the Company).  In the event that the Participant is not authorized or is unable to provide an electronic Exercise Notice, the Option shall be exercised by a written Exercise Notice addressed to the Company, which shall be signed by the Participant and delivered in person, by certified or registered mail, return receipt requested, by confirmed facsimile transmission, or by such other means as the Company may permit, to the Company, or an authorized representative of the Company (including a third-party administrator designated by the Company).  Each Exercise Notice, whether electronic or written, must state the Participant's election to exercise the Option, the number of whole Shares for which the Option is being exercised and such other representations and agreements as to the Participant's investment intent with respect to such shares as may be required pursuant to the provisions of this Option Agreement.  Further, each Exercise Notice must be received by the Company prior to the termination of the Option as set forth in Section 6 and must be accompanied by full payment of the aggregate Exercise Price for the number of Shares being purchased.  The Option shall be deemed to be exercised upon receipt by the Company of such electronic or written Exercise Notice and the aggregate Exercise Price.

**4.3. Payment of Exercise Price.**

**a. *Forms of Consideration Authorized.***  Except as otherwise provided below, payment of the aggregate Exercise Price for the number of Shares for which the Option is being exercised shall be made (i) in cash or by check or cash equivalent, (ii) if permitted by the Company, by tender to the Company, or attestation to the ownership, of whole Shares owned by the Participant having a Fair Market Value not less than the aggregate Exercise Price, (iii) by means of a Cashless Exercise, as defined in Section 4.3(b), or (iv) by any combination of the foregoing.

**b.** ***Limitations on Forms of Consideration.***

**i.** **Tender of Shares.** Notwithstanding the foregoing, the Option may not be exercised by tender to the Company, or attestation to the ownership, of Shares to the extent such tender or attestation would constitute a violation of the provisions of any law, regulation or agreement restricting the redemption of the Company's Shares. If required by the Company, the Option may not be exercised by tender to the Company, or attestation to the ownership, of Shares unless such shares either have been owned by the Participant for more than six (6) months or such other period, if any, required by the Company (and not used for another option exercise by attestation during such period) or were not acquired, directly or indirectly, from the Company.

**ii.** **Cashless Exercise.** A "***Cashless Exercise***" means the delivery of a properly executed notice together with irrevocable instructions to a broker in a form acceptable to the Company providing for the assignment to the Company of the proceeds of a sale or loan with respect to some or all of the Shares acquired upon the exercise of the Option pursuant to a program or procedure approved by the Company (including, without limitation, through an exercise complying with the provisions of Regulation T as promulgated from time to time by the Board of Governors of the Federal Reserve System). The Company reserves, at any and all times, the right, in the Company's sole and absolute discretion, to establish, decline to approve, or terminate any such program or procedure, including with respect to the Participant notwithstanding that such program or procedures may be available to others.

**4.4. Tax Withholding**.

**a.** ***In General.*** At the time the Award Agreement is executed, or at any time thereafter as requested by the Company, the Participant hereby authorizes withholding from payroll and any other amounts payable to the Participant, and otherwise agrees to make adequate provision for, any sums required to satisfy the federal, state, local and foreign tax withholding obligations of the Company, if any, which arise in connection with the grant, vesting or exercise of the Option or the issuance of Shares in settlement thereof. The Company shall have no obligation to deliver Shares until the tax obligations of the Company have been satisfied by the Participant.

**b.** ***Withholding in Securities.*** The Company may, in its discretion, permit or require the Participant to satisfy all or any portion of the tax obligations by deducting from the Shares otherwise deliverable to the Participant in settlement of the Option a number of Shares having a fair market value, as determined by the Company as of the date on which the tax obligations arise, not in excess of the amount of such tax obligations determined by the applicable withholding rates. In the event that the Company determines that the tax obligations will not be satisfied by the method described above, Participant authorizes the designated plan administrator or any successor plan administrator, to sell a number of Shares that are purchased under the Option, which the Company determines is sufficient to generate an amount that meets the tax obligations plus additional Shares, as necessary. To account for rounding and market fluctuation, and to pay such tax withholding amounts to the Company. The Shares may be sold as part of a block trade with other Participants of the Plan in which all Participants receive an average price. Any adverse consequences to the Participant resulting from the procedure

DocuSign Envelope ID: EE7284F6-8E05-437F-89CB-CCEBC56CDE42

permitted under this Section 4.4, including, without limitation, tax consequences, shall be the sole responsibility of the Participant.

     **c.**      ***Consultation***.   The Participant hereby acknowledges that he or she understands that the Participant may suffer adverse tax consequences as a result of the Participant's exercise of the Option or disposition of the Shares. The Participant hereby represents that the Participant has consulted with any tax consultants the Participant deems advisable in connection with the exercise of the Option or disposition of the Shares and that the Participant is not relying on the Company for any tax advice.

    **4.5. Beneficial Ownership of Shares; Certificate Registration.** The Participant hereby authorizes the Company, in its sole discretion, to deposit for the benefit of the Participant with any broker with which the Participant has an account relationship of which the Company has notice any or all shares acquired by the Participant pursuant to the exercise of the Option. Except as provided by the preceding sentence, a certificate for the shares as to which the Option is exercised shall be registered in the name of the Participant, or, if applicable, in the names of the heirs of the Participant.

    **4.6. Restrictions on Grant of the Option and Issuance of Shares.** The grant of the Option and the issuance of Shares upon exercise of the Option shall be subject to compliance with all applicable requirements of federal, state or foreign law with respect to such securities. The Option may not be exercised if the issuance of Shares upon exercise would constitute a violation of any applicable federal, state or foreign securities laws or other law or regulations or the requirements of any stock exchange or market system upon which the Shares may then be listed. In addition, the Option may not be exercised unless (i) a registration statement under the Securities Act shall at the time of exercise of the Option be in effect with respect to the shares issuable upon exercise of the Option or (ii) in the opinion of legal counsel to the Company, the shares issuable upon exercise of the Option may be issued in accordance with the terms of an applicable exemption from the registration requirements of the Securities Act. THE PARTICIPANT IS CAUTIONED THAT THE OPTION MAY NOT BE EXERCISED UNLESS THE FOREGOING CONDITIONS ARE SATISFIED. ACCORDINGLY, THE PARTICIPANT MAY NOT BE ABLE TO EXERCISE THE OPTION WHEN DESIRED EVEN THOUGH THE OPTION IS VESTED. The inability of the Company to obtain from any regulatory body having jurisdiction the authority, if any, deemed by the Company's legal counsel to be necessary to the lawful issuance and sale of any shares subject to the Option shall relieve the Company of any liability in respect of the failure to issue or sell such shares as to which such requisite authority shall not have been obtained. As a condition to the exercise of the Option, the Company may require the Participant to satisfy any qualifications that may be necessary or appropriate, to evidence compliance with any applicable law or regulation and to make any representation or warranty with respect thereto as may be requested by the Company.

    **4.7. Fractional Shares.** The Company shall not be required to issue fractional shares upon the exercise of the Option.

**5.   NONTRANSFERABILITY OF THE OPTION.**

During the lifetime of the Participant, the Option shall be exercisable only by the Participant or the Participant's guardian or legal representative.  The Option shall not be subject in any manner to anticipation, alienation, sale, exchange, transfer, assignment, pledge, encumbrance, or garnishment by creditors of the Participant or the Participant's beneficiary, except transfer by will or by the laws of descent and distribution.  Following the death of the Participant, the Option, to the extent provided in Section 7, may be exercised by the Participant's legal representative or by any person empowered to do so under the deceased Participant's will or under the then applicable laws of descent and distribution.

**6.   TERMINATION OF THE OPTION.**

The Option shall terminate and may no longer be exercised after the first to occur of (a) the close of business on the Option Expiration Date, (b) the close of business on the last date for exercising the Option following termination of the Participant's Service as described in Section 7 below, or (c) a Change in Control to the extent provided in Section 9 of the Plan.

**7.   EFFECT OF TERMINATION OF SERVICE.**

**7.1. Option Exercisability.**  The Option shall terminate immediately upon the Participant's termination of Service to the extent that it is then unvested and shall be exercisable after the Participant's termination of Service to the extent it is then vested only during the applicable time period as determined below and thereafter shall terminate.

**a.**        ***Disability.***  If the Participant's Service terminates because of the Disability of the Participant, the Option, to the extent unexercised and exercisable for Vested Shares on the date on which the Participant's Service terminated, may be exercised by the Participant (or the Participant's guardian or legal representative) at any time prior to the expiration of twelve (12) months after the date on which the Participant's Service terminated, but in any event no later than the Option Expiration Date.

**b.**        ***Death.***  If the Participant's Service terminates because of the death of the Participant, the Option, to the extent unexercised and exercisable for Vested Shares on the date on which the Participant's Service terminated, may be exercised by the Participant's legal representative or other person who acquired the right to exercise the Option by reason of the Participant's death at any time prior to the expiration of twenty four (24) months after the date on which the Participant's Service terminated, but in any event no later than the Option Expiration Date.  The Participant's Service shall be deemed to have terminated on account of death if the Participant dies within three (3) months after the Participant's termination of Service.

**c.**        ***Termination for Cause.***  Notwithstanding any other provision of this Option Agreement, if the Participant's Service is terminated for Cause, the Option shall terminate and cease to be exercisable ninety (90) days after such termination of Service for Cause.

**d.**        ***Other Termination of Service.***  If the Participant's Service terminates for any reason, except Disability, death or Cause, the Option, to the extent unexercised and

DocuSign Envelope ID: EE7284E6-8E05-437F-89CB-CCEBC56CDE42

exercisable for Vested Shares by the Participant on the date on which the Participant's Service terminated, may be exercised by the Participant at any time prior to the expiration of two (2) years after the date on which the Participant's Service terminated, but in any event no later than the Option Expiration Date.

**7.2. Extension if Exercise Prevented by Law.** Notwithstanding the foregoing other than termination of Service for Cause, if the exercise of the Option within the applicable time periods set forth in Section 7.1 is prevented by the provisions of Section 4.6, the Option shall remain exercisable until the later of (a) thirty (30) days after the date such exercise first would no longer be prevented by such provisions or (b) the end of the applicable time period under Section 7.1, but in any event no later than the Option Expiration Date.

**8. RIGHTS AS A SHAREHOLDER, DIRECTOR, EMPLOYEE OR CONSULTANT.**

The Participant shall have no rights as a shareholder with respect to any shares covered by the Option until the date of the issuance of the shares for which the Option has been exercised (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company). No adjustment shall be made for dividends, distributions or other rights for which the record date is prior to the date the shares are issued, except as provided in Section 4.2 of the Plan. If the Participant is an Employee, the Participant understands and acknowledges that, except as otherwise provided in a separate, written employment agreement between a Participating Company and the Participant, the Participant's employment is "at will" and is for no specified term. Nothing in this Option Agreement shall confer upon the Participant any right to continue in the Service of a Participating Company or interfere in any way with any right of the Participating Company Group to terminate the Participant's Service as a Director, an Employee or Consultant, as the case may be, at any time.

**9. RIGHT OF FIRST REFUSAL.**

**9.1. Grant of Right of First Refusal.** Except as provided in Section 9.7 and Section 14 below, in the event the Participant, the Participant's legal representative, or other holder of shares acquired upon exercise of the Option proposes to sell, exchange, transfer, pledge, or otherwise dispose of any Vested Shares (the "*Transfer Shares*") to any person or entity, including, without limitation, any shareholder of a Participating Company, the Company shall have the right to repurchase the Transfer Shares under the terms and subject to the conditions set forth in this Section 9 (the "*Right of First Refusal*").

**9.2. Notice of Proposed Transfer.** Prior to any proposed transfer of the Transfer Shares, the Participant shall deliver written notice (the "*Transfer Notice*") to the Company describing fully the proposed transfer, including the number of Transfer Shares, the name and address of the proposed transferee (the "*Proposed Transferee*") and, if the transfer is voluntary, the proposed transfer price, and containing such information necessary to show the bona fide nature of the proposed transfer. In the event of a bona fide gift or involuntary transfer, the proposed transfer price shall be deemed to be the Fair Market Value of the Transfer Shares, as determined by the Board in good faith. If the Participant proposes to transfer any Transfer Shares to more than one Proposed Transferee, the Participant shall provide a separate Transfer Notice for the proposed transfer to each Proposed Transferee. The Transfer Notice shall be signed by both the

Participant and the Proposed Transferee and must constitute a binding commitment of the Participant and the Proposed Transferee for the transfer of the Transfer Shares to the Proposed Transferee subject only to the Right of First Refusal.

**9.3.    Bona Fide Transfer.**  If the Company determines that the information provided by the Participant in the Transfer Notice is insufficient to establish the bona fide nature of a proposed voluntary transfer, the Company shall give the Participant written notice of the Participant's failure to comply with the procedure described in this Section 9, and the Participant shall have no right to transfer the Transfer Shares without first complying with the procedure described in this Section 9.  The Participant shall not be permitted to transfer the Transfer Shares if the proposed transfer is not bona fide.

**9.4.    Exercise of Right of First Refusal.**  If the Company determines the proposed transfer to be bona fide, the Company shall have the right to purchase all, but not less than all, of the Transfer Shares (except as the Company and the Participant otherwise agree) at the purchase price and on the terms set forth in the Transfer Notice by delivery to the Participant of a notice of exercise of the Right of First Refusal within thirty (30) days after the date the Transfer Notice is delivered to the Company.  The Company's exercise or failure to exercise the Right of First Refusal with respect to any proposed transfer described in a Transfer Notice shall not affect the Company's right to exercise the Right of First Refusal with respect to any proposed transfer described in any other Transfer Notice, whether or not such other Transfer Notice is issued by the Participant or issued by a person other than the Participant with respect to a proposed transfer to the same Proposed Transferee.  If the Company exercises the Right of First Refusal, the Company and the Participant shall thereupon consummate the sale of the Transfer Shares to the Company on the terms set forth in the Transfer Notice within sixty (60) days after the date the Transfer Notice is delivered to the Company (unless a longer period is offered by the Proposed Transferee); provided, however, that in the event the Transfer Notice provides for the payment for the Transfer Shares other than in cash, the Company shall have the option of paying for the Transfer Shares by the present value cash equivalent of the consideration described in the Transfer Notice as reasonably determined by the Company.  For purposes of the foregoing, cancellation of any indebtedness of the Participant to any Participating Company shall be treated as payment to the Participant in cash to the extent of the unpaid principal and any accrued interest canceled.

**9.5.    Failure to Exercise Right of First Refusal.**  If the Company fails to exercise the Right of First Refusal in full (or to such lesser extent as the Company and the Participant otherwise agree) within the period specified in Section 9.4 above, the Participant may conclude a transfer to the Proposed Transferee of the Transfer Shares on the terms and conditions described in the Transfer Notice, provided such transfer occurs not later than ninety (90) days following delivery to the Company of the Transfer Notice.  The Company shall have the right to demand further assurances from the Participant and the Proposed Transferee (in a form satisfactory to the Company) that the transfer of the Transfer Shares was actually carried out on the terms and conditions described in the Transfer Notice.  No Transfer Shares shall be transferred on the books of the Company until the Company has received such assurances, if so demanded, and has approved the proposed transfer as bona fide.  Any proposed transfer on terms and conditions different from those described in the Transfer Notice, as well as any subsequent proposed transfer by the Participant, shall again be subject to the Right of First Refusal and shall require

compliance by the Participant with the procedure described in this Section 9.

**9.6.    Transferees of Transfer Shares.**  All transferees of the Transfer Shares or any interest therein, other than the Company, shall be required as a condition of such transfer to agree in writing (in a form satisfactory to the Company) that such transferee shall receive and hold such Transfer Shares or interest therein subject to all of the terms and conditions of this Option Agreement, including this Section 9 providing for the Right of First Refusal with respect to any subsequent transfer.  Any sale or transfer of any shares acquired upon exercise of the Option shall be void unless the provisions of this Section 9 are met.

**9.7.    Transfers Not Subject to Right of First Refusal.**  The Right of First Refusal shall not apply to any transfer or exchange of the shares acquired upon exercise of the Option if such transfer or exchange is in connection with an Ownership Change Event.  If the consideration received pursuant to such transfer or exchange consists of stock of a Participating Company, such consideration shall remain subject to the Right of First Refusal unless the provisions of Section 9.9 below result in a termination of the Right of First Refusal.

**9.8.    Assignment of Right of First Refusal.**  The Company shall have the right to assign the Right of First Refusal at any time, whether or not there has been an attempted transfer, to one or more persons as may be selected by the Company.

**9.9.    Early Termination of Right of First Refusal.**  The other provisions of this Option Agreement notwithstanding, the Right of First Refusal shall terminate and be of no further force and effect upon (a) the occurrence of a Change in Control, unless the Acquiror assumes the Company's rights and obligations under the Option or substitutes a substantially equivalent option for the Acquiror's stock for the Option, or (b) the existence of a public market for the class of shares subject to the Right of First Refusal.  A "***public market***" shall be deemed to exist if (i) such stock is listed on a national securities exchange (as that term is used in the Exchange Act) or (ii) such stock is traded on the over the counter market and prices therefor are published daily on business days in a recognized financial journal.

## 10. SHARE DISTRIBUTIONS SUBJECT TO OPTION AGREEMENT.

If, from time to time, there is any stock dividend, stock split or other change, as described in Section 9, in the character or amount of any of the outstanding Shares of the Company subject to the provisions of this Option Agreement, then in such event any and all new, substituted or additional securities to which the Participant is entitled by reason of the Participant's ownership of the shares acquired upon exercise of the Option shall be immediately subject to the Right of First Refusal with the same force and effect as the shares subject to the Right of First Refusal immediately before such event.

## 11. NOTICE OF SALES UPON DISQUALIFYING DISPOSITION.

The Participant shall dispose of the shares acquired pursuant to the Option only in accordance with the provisions of this Option Agreement.  In addition, *if the Grant Notice designates this Option as an Incentive Stock Option*, the Participant shall (a) promptly notify the stock plan administrator for the Company if the Participant disposes of any of the shares acquired pursuant to the Option within one (1) year after the date the Participant exercises all or

part of the Option or within two (2) years after the Date of Grant and (b) provide the Company with a description of the circumstances of such disposition. Until such time as the Participant disposes of such shares in a manner consistent with the provisions of this Option Agreement, unless otherwise expressly authorized by the Company, the Participant shall hold all shares acquired pursuant to the Option in the Participant's name (and not in the name of any nominee) for the one-year period immediately after the exercise of the Option and the two-year period immediately after Date of Grant. At any time during the one-year or two-year periods set forth above, the Company may place a legend on any certificate representing shares acquired pursuant to the Option requesting the transfer agent for the Company's Shares to notify the Company of any such transfers. The obligation of the Participant to notify the Company of any such transfer shall continue notwithstanding that a legend has been placed on the certificate pursuant to the preceding sentence.

## 12. LEGENDS.

**12.1.** The Company may at any time place legends referencing the Right of First Refusal and any applicable federal, state or foreign securities law restrictions on all certificates representing Shares subject to the provisions of this Option Agreement. The Participant shall, at the request of the Company, promptly present to the Company any and all certificates representing shares acquired pursuant to the Option in the possession of the Participant in order to carry out the provisions of this Section. Unless otherwise specified by the Company, legends placed on such certificates may include, but shall not be limited to, the following:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 OR RULE 701 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT."

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER, INCLUDING A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE COMPANY OR ITS ASSIGNEE SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDER, OR SUCH HOLDER'S PREDECESSOR IN INTEREST, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THIS COMPANY."

"THE SHARES EVIDENCED BY THIS CERTIFICATE WERE ISSUED BY THE COMPANY TO THE REGISTERED HOLDER UPON EXERCISE OF AN INCENTIVE STOCK OPTION AS DEFINED IN SECTION 422 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED ("ISO"). IN ORDER TO OBTAIN THE PREFERENTIAL TAX TREATMENT AFFORDED TO ISOs, THE SHARES SHOULD NOT BE TRANSFERRED PRIOR TO *[INSERT DISQUALIFYING DISPOSITION DATE HERE]*. SHOULD THE REGISTERED HOLDER ELECT TO TRANSFER ANY OF THE SHARES PRIOR TO THIS

DATE AND FOREGO ISO TAX TREATMENT, THE TRANSFER AGENT FOR THE SHARES SHALL NOTIFY THE COMPANY IMMEDIATELY.  THE REGISTERED HOLDER SHALL HOLD ALL SHARES PURCHASED UNDER THE INCENTIVE STOCK OPTION IN THE REGISTERED HOLDER'S NAME (AND NOT IN THE NAME OF ANY NOMINEE) PRIOR TO THIS DATE OR UNTIL TRANSFERRED AS DESCRIBED ABOVE."

### 13. LOCK-UP AGREEMENT.

The Participant hereby agrees that in the event of any underwritten public offering of stock, including an initial public offering of stock, made by the Company pursuant to an effective registration statement filed under the Securities Act, the Participant shall not offer, sell, contract to sell, pledge, hypothecate, grant any option to purchase or make any short sale of, or otherwise dispose of any Shares of the Company or any rights to acquire stock of the Company for such period of time from and after the effective date of such registration statement as may be established by the underwriter for such public offering.  The foregoing limitation shall not apply to shares registered in the public offering under the Securities Act.  The Participant hereby agrees to enter into any agreement reasonably required by the underwriters to implement the foregoing within a reasonable timeframe if so requested by the Company.

### 14. RESTRICTIONS ON TRANSFER OF SHARES.

**14.1.  Restrictions on Transfer.**  Except as permitted by the Board, at its sole discretion, no shares acquired upon exercise of the Option may be sold, exchanged, transferred (including, without limitation, any transfer to a nominee or agent of the Participant), assigned, pledged, hypothecated or otherwise disposed of, including by operation of law.  The Company shall not be required  to transfer on its books any shares which will have been transferred in violation of any of the provisions set forth in this Option Agreement.

**14.2.  Permitted Transfer Subject to Company's Right of First Refusal.**  In the event that the Board permits the transfer of shares acquired upon exercise of the Option, any transfer of said shares shall be subject to the Company's Right of First Refusal as set forth in Section 9 of this Option Agreement.

**14.3.  Termination of Restrictions on Transfer of Shares.**  The other provisions of this Option Agreement notwithstanding, the Restriction on Transfer of Shares shall terminate and be of no further force and effect upon (a) the occurrence of a Change in Control, unless the Acquiror assumes the Company's rights and obligations under the Option or substitutes a substantially equivalent option for the Acquiror's stock for the Option, or (b) the existence of a public market (as defined in Section 9.9 of this Option Agreement) for the class of shares subject to the Restrictions on the Transfer of Shares.

## 15. MISCELLANEOUS PROVISIONS.

**15.1. Termination or Amendment.** The Board may terminate or amend the Plan or the Option at any time; provided, however, that except as provided in Section 8 in connection with a Change in Control, no such termination or amendment may adversely affect the Option or any unexercised portion hereof without the consent of the Participant unless such termination or amendment is necessary to comply with any applicable law or government regulation, including, but not limited to Section 409A of the Code. No amendment or addition to this Option Agreement shall be effective unless in writing.

**15.2. Compliance with Section 409A.** The Company intends that income realized by the Participant pursuant to the Plan and this Option Agreement will not be subject to taxation under Section 409A of the Code. The provisions of the Plan and this Option Agreement shall be interpreted and construed in favor of satisfying any applicable requirements of Section 409A of the Code. The Company, in its reasonable discretion, may amend (including retroactively) the Plan and this Agreement in order to conform to the applicable requirements of Section 409A of the Code, including amendments to facilitate the Participant's ability to avoid taxation under Section 409A of the Code. However, the preceding provisions shall not be construed as a guarantee by the Company of any particular tax result for income realized by the Participant pursuant to the Plan or this Option Agreement. In any event, and except for the responsibilities of the Company set forth in Section 4.4 above, no Participating Company shall be responsible for the payment of any applicable taxes on income realized by the Participant pursuant to the Plan or this Option Agreement.

**15.3. Further Instruments.** The parties hereto agree to execute such further instruments (including, but not limited to, a joinder to the Shareholders Rights Agreement referred to in Section 13.4 of the Plan) and to take such further action as may reasonably be necessary to carry out the intent of this Option Agreement.

**15.4. Binding Effect.** Subject to the restrictions on transfer set forth herein, this Option Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, successors and assigns.

**15.5. Delivery of Documents and Notices.** Any document relating to participation in the Plan, or any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given (except to the extent that this Option Agreement provides for effectiveness only upon actual receipt of such notice) upon personal delivery electronic delivery at the e-mail address, if any, provided for the Participant by the Participating Company, or, upon deposit in the U.S. Post Office or foreign postal service, by registered or certified mail, or with a nationally recognized overnight courier service with postage and fees prepaid, addressed to the other party at the address of such party set forth in the Grant Notice or at such other address as such party may designate in writing from time to time to the other party.

    **a. Description of Electronic Delivery.** The Plan documents, which may include but do not necessarily include: the Plan, the Grant Notice, this Option Agreement, and any reports of the Company provided generally to the Company's shareholders, may be delivered to the Participant electronically. In addition, if permitted by the Company, the Participant may deliver

electronically the Grant Notice and Exercise Notice called for by Section 4.2 to the Company or to such third party involved in administering the Plan as the Company may designate from time to time. Such means of electronic delivery may include but do not necessarily include the delivery of a link to a Company intranet or the internet site of a third party involved in administering the Plan, the delivery of the document via e-mail or such other means of electronic delivery specified by the Company.

    **b.  Consent to Electronic Delivery.**  The Participant acknowledges that the Participant has read Section 15.5(a) of this Option Agreement and consents to the electronic delivery of the Plan documents and, if permitted by the Company, the delivery of the Grant Notice and Exercise Notice, as described in Section 15.5(a).  The Participant acknowledges that he or she may receive from the Company a paper copy of any documents delivered electronically at no cost to the Participant by contacting the Company by telephone or in writing.  The Participant further acknowledges that the Participant will be provided with a paper copy of any documents if the attempted electronic delivery of such documents fails.  Similarly, the Participant understands that the Participant must provide the Company or any designated third party administrator with a paper copy of any documents if the attempted electronic delivery of such documents fails.  The Participant may revoke his or her consent to the electronic delivery of documents described in Section 15.5(a) or may change the electronic mail address to which such documents are to be delivered (if Participant has provided an electronic mail address) at any time by notifying the Company of such revoked consent or revised e-mail address by telephone, postal service or electronic mail.  Finally, the Participant understands that he or she is not required to consent to electronic delivery of documents described in Section 15.5(a).

    **15.6.  Integrated Agreement.**  The Grant Notice, this Option Agreement and the Plan, together with any employment, service or other agreement with the Participant and a Participating Company referring to the Option, shall constitute the entire understanding and agreement of the Participant and the Participating Company Group with respect to the subject matter contained herein or therein and supersede any prior agreements, understandings, restrictions, representations, or warranties among the Participant and the Participating Company Group with respect to such subject matter.  To the extent contemplated herein or therein, the provisions of the Grant Notice, the Option Agreement and the Plan shall survive any exercise of the Option and shall remain in full force and effect.

    **15.7.  Applicable Law.**  This Option Agreement shall be governed by the laws of the State of Delaware as such laws are applied to agreements between Delaware residents entered into and to be performed entirely within the State of Delaware.

    **15.8.  Counterparts.**  The Grant Notice may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

\_\_ Incentive Stock Option          Participant: _____

\_\_ Nonstatutory Stock Option      Date: _____

**STOCK OPTION EXERCISE NOTICE**
**(IMMEDIATELY EXERCISABLE OPTION)**

OpenSpend, Inc

Attention: _____

_____

_____

Ladies and Gentlemen:

1.        **Option.**  I was granted an option (the *"Option"*) to purchase shares of the common stock (the *"Shares"*) of OpenSpend, Inc (the *"Company"*) pursuant to the Company's Stock Incentive Plan (the *"Plan"*), my Notice of Grant of Stock Option (the *"Grant Notice"*) and my Stock Option Agreement (the *"Option Agreement"*) as follows:

         Date of Grant: _____

         Number of Option Shares: _____

         Exercise Price per Share: $ _____

2.        **Exercise of Option.**  I hereby elect to exercise the Option to purchase the following number of Shares, all of which are Vested Shares, in accordance with the Grant Notice and the Option Agreement:

         Total Shares Purchased: _____

         Total Exercise Price (Total Shares  X  Price per Share)  $ _____

3.        **Payments.**  I enclose payment in full of the total exercise price for the Shares in the following form(s), as authorized by my Option Agreement:

         \_\_ Cash:                                        $ _____

         \_\_ Check:                                     $ _____

         \_\_ Tender of Company Shares:            Contact Plan Administrator

4.        **Tax Withholding.**  I authorize payroll withholding and otherwise will make adequate provision for the federal, state, local and foreign tax withholding obligations of the Company, if any, in connection with the Option.  If I am exercising a Nonstatutory Stock Option, I enclose payment in full of my withholding taxes, if any, as follows:

         **(Contact Plan Administrator for amount of tax due.)**

         \_\_ Cash:                                        $ _____

         \_\_ Check:                                     $ _____

5.        **Participant Information.**

      My address is: _____

                                           _____

      My Social Security Number is: _____

6.        **Notice of Disqualifying Disposition.**  If the Option is an Incentive Stock Option, I agree that I will promptly notify the Company if I transfer any of the Shares within one (1) year from the date I exercise all or part of the Option or within two (2) years of the Date of Grant.

7. **Repurchase Rights.**

A. **Company Repurchase Right – Unvested Option Shares and Termination for Cause**. I hereby agree that if (i) any of the Option shares issued to me are not vested at the time of my termination of Service or (ii) my Service to the Company is terminated for Cause, the Company or its assignee of rights hereunder shall upon the date of the termination (the "***Termination Date***") have an irrevocable right and exclusive option (the "***Repurchase Right***") to repurchase from me, or my personal representative, as the case may be, all or any portion of the exercised Shares received pursuant to the Agreement at (i) for unvested Option Shares – at the lower of the Exercise Price paid by me or the Fair Market Value on the date the Repurchase Right is exercised; and (ii) for repurchase following termination for Cause - at the Fair Market Value of the Shares on the date the Repurchase Right is exercised (collectively the "***Repurchase Price***"). Subject to this Section 7, the Repurchase Right may be exercised in writing by the Company at any time after the later to occur of (i) the Termination Date and (ii) the six- (6) month anniversary of the date the Shares were acquired by me.

B. **Payment**. The Company, at its election, may satisfy its payment obligation to me with respect to exercise of the Repurchase Right by either (i) delivering a check to me in the amount of the aggregate Repurchase Price for the Shares being repurchased, or (ii) in the event that I am indebted to the Company, offsetting the aggregate Repurchase Price for the Shares being repurchased with an amount of such indebtedness equal to the aggregate Repurchase Price for the Shares being repurchased, or (iii) by a combination of (i) and (ii) so that the combined payment and cancellation of indebtedness equals the aggregate Repurchase Price. At its election, the Company or its assignee of rights hereunder may elect to make payment for the Shares to a bank selected by the Company. The Company shall avail itself of this election by a notice in writing to me stating the name and address of the bank, date of closing, and waiving the closing at the Company's office. As a result of any repurchase of Shares pursuant to this Section 7, the Company shall become the legal and beneficial owner of the Shares being repurchased and shall have all rights and interest therein or related thereto to the extent permitted by Applicable Laws and Company's articles of association, and the Company shall have the right to transfer to its own name the number of Shares being repurchased by the Company, without further action by me.

C. **Change in Control**. In the event of Change in Control, any Repurchase Right under this Section 7 shall remain in full force and effect and shall apply to the new shares of capital received in exchange for the Shares in consummation of the Change in Control.

D. **Lapse**. Notwithstanding any other provision of this Agreement, any Repurchase Right provided in this Section 7 shall terminate as to any Shares upon the earlier to occur of (i) a Qualified Public Offering and (ii) a Change in Control in which the successor corporation has equity securities that are publicly traded.

E. **Power of Attorney**. I hereby grant an irrevocable power of attorney to the Company to sell and transfer the Shares in my name to the Company at Fair Market Value, subject to (i) the Company exercising the Repurchase Right, and (ii) the terms and conditions included in this Agreement and the Plan. In performing acts pursuant to this power of attorney, the Company may act pursuant to a power of attorney granted by one or more other persons involved in the acts referred to in the previous sentence.

F. **Deposit of Unvested Shares**. Upon issuance, the certificate for any unvested Shares subject to repurchase rights hereunder shall be deposited in escrow with the Company to be held in accordance with the provisions of this Agreement. Such deposited certificate shall be accompanied by a duly executed Assignment Separate from Certificate in the form of <u>Exhibit A</u> attached hereto. The deposited certificate, together with any other assets or securities from time to time deposited with the Company pursuant to the requirements of this Agreement, shall remain in escrow until such time or times as the certificate (or other assets and securities) shall be released or otherwise surrendered for cancellation

8. **Binding Effect.** I agree that the Shares are being acquired in accordance with and subject to the terms, provisions and conditions of the Grant Notice, the Option Agreement, including the Right of First Refusal set forth therein, and the Plan, to all of which I hereby expressly assent. This Agreement shall inure to the benefit of and be binding upon my heirs, executors, administrators, successors and assigns.

9. **Investment Representation.** I hereby makes the investment representations listed on <u>**Exhibit B**</u> to the Company as of the date of this Agreement and agree that such representations are incorporated into

this Agreement by this reference, such that the Company may rely on them in issuing the Shares. I understand and acknowledge that the Shares have not been registered under the Securities Act of 1933, as amended (the *"Securities Act"*), and that consequently the Shares must be held indefinitely unless they are subsequently registered under the Securities Act, an exemption from such registration is available, or they are sold in accordance with Rule 144 or Rule 701 under the Securities Act.  I further understand and acknowledge that the Company is under no obligation to register the Shares.  I understand that the certificate or certificates evidencing the Shares will be imprinted with legends which prohibit the transfer of the Shares unless they are registered or such registration is not required in the opinion of legal counsel satisfactory to the Company.

        10.     **SPECIAL TAX ELECTION**.   The acquisition of Shares may result in adverse tax consequences which may be avoided or mitigated by filing an election under Code Section 83(b). Such election must be filed within thirty (30) days after the date of this Agreement. A description of the tax consequences applicable to the acquisition of the Purchased Shares and the form for making the Code Section 83(b) election are attached hereto. **PARTICIPANT SHOULD CONSULT WITH HIS OR HER TAX ADVISOR TO DETERMINE THE TAX CONSEQUENCES OF ACQUIRING THE PURCHASED SHARES AND THE ADVANTAGES AND DISADVANTAGES OF FILING THE CODE SECTION 83(b) ELECTION. PARTICIPANT ACKNOWLEDGES THAT IT IS PARTICIPANT'S SOLE RESPONSIBILITY, AND NOT THE COMPANY'S, TO FILE A TIMELY ELECTION UNDER CODE SECTION 83(b), EVEN IF PARTICIPANT REQUESTS THE COMPANY OR ITS REPRESENTATIVES TO MAKE THIS FILING ON HIS OR HER BEHALF. SEE <u>EXHIBIT C</u> FOR CODE SECTION 83(b) FORMS.**

        I am aware that Rule 144 under the Securities Act, which permits limited public resale of securities acquired in a nonpublic offering, is not currently available with respect to the Shares and, in any event, is available only if certain conditions are satisfied.  I understand that any sale of the Shares that might be made in reliance upon Rule 144 may only be made in limited amounts in accordance with the terms and conditions of such rule and that a copy of Rule 144 will be delivered to me upon request.

        I understand that I am purchasing the Shares pursuant to the terms of the Plan, the Grant Notice and my Option Agreement, copies of which I have received and carefully read and understand.

Participant: _____
        (Signature)

              * * * * *

I, _____, spouse of Participant, have read and hereby approve the foregoing Agreement.  In consideration of the Company's granting my spouse the right to purchase the Shares as set forth in the Agreement, I hereby agree to be bound irrevocably by the Agreement and further agree that any community property or other such interest that I may have in the Shares shall hereby be similarly bound by the Agreement.  I hereby appoint my spouse as my attorney-in-fact with respect to any amendment or exercise of any rights under the Agreement.

_____
Spouse Signature
Date: _____

Receipt of the above is hereby acknowledged.
OpenSpend, Inc

By: _____
Title: _____
Dated: _____

## EXHIBIT A

## STOCK POWER AND ASSIGNMENT
## SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED and pursuant to that certain Stock Option Exercise Notice dated as of _____, 2016 the undersigned hereby sells, assigns and transfers unto _____, _____ (_____) shares of common stock of OpenSpend, Inc, a Delaware corporation (the "Company"), standing in the undersigned's name on the books of said Company represented by certificate number _____ delivered herewith, and does hereby irrevocably constitute and appoint the Company (and each of its officers) as attorney-in-fact, with full power of substitution, to transfer said stock on the books of said Company.

Dated: _____

_____
*(Signature)*

_____
*(Print Name)*

_____
*(Spouse's Signature, if any)*

_____
*(Print Name)*

This Assignment Separate From Certificate was executed in conjunction with the terms of a Stock Option  Agreement between the above assignor and the above Company, dated as of _____ ____, 2016.

**Instruction: Please do not fill in any blanks other than the signature and name lines.**

DocuSign Envelope ID: EE7284F6-8E05-437F-89CB-CCEBC56CDE42

**EXHIBIT B**

**INVESTMENT REPRESENTATION STATEMENT**

PURCHASER    :    _____

COMPANY    :    OpenSpend, Inc

SECURITY    :    Common Stock

AMOUNT    :    _____ Shares

DATE    :

---

In connection with the purchase of the above-listed shares, I, the undersigned purchaser, represent to the Company as follows:

1. *The Company may rely on these representations*. I understand that the Company's sale of the shares to me has not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), because the Company believes, relying in part on my representations in this document, that an exemption from such registration requirement is available for such sale. I understand that the availability of this exemption depends upon the representations I am making to the Company in this document being true and correct.

2. *I am purchasing for investment*. I am purchasing the shares solely for investment purposes, and not for further distribution. My entire legal and beneficial ownership interest in the shares is being purchased and shall be held solely for my account, except to the extent I intend to hold the shares jointly with my spouse. I am not a party to, and do not presently intend to enter into, any contract or other arrangement with any other person or entity involving the resale, transfer, grant of participation with respect to or other distribution of any of the shares. My investment intent is not limited to my present intention to hold the shares for the minimum capital gains period specified under any applicable tax law, for a deferred sale, for a specified increase or decrease in the market price of the shares, or for any other fixed period in the future.

3. *I can protect my own interests*. I can properly evaluate the merits and risks of an investment in the shares and can protect my own interests in this regard, whether by reason of my own business and financial expertise, the business and financial expertise of certain professional advisors unaffiliated with the Company with whom I have consulted, or my preexisting business or personal relationship with the Company or any of its officers, directors or controlling persons.

4. *I am informed about the Company*. I am sufficiently aware of the Company's business affairs and financial condition to reach an informed and knowledgeable decision to acquire the shares. I have had opportunity to discuss the plans, operations and financial condition of the Company with its officers, directors or controlling persons, and have received all information I deem appropriate for assessing the risk of an investment in the shares.

5. *I recognize my economic risk*. I realize that the purchase of the shares involves a high degree of risk, and that the Company's future prospects are uncertain. I am able to hold the shares indefinitely if required, and am able to bear the loss of my entire investment in the shares.

6.  *I know that the shares are restricted securities.* I understand that the shares are "restricted securities" in that the Company's sale of the shares to me has not been registered under the Securities Act in reliance upon an exemption for non-public offerings. In this regard, I also understand and agree that:

      A.  I must hold the shares indefinitely, unless any subsequent proposed resale by me is registered under the Securities Act, or unless an exemption from registration is otherwise available (such as Rule 144);

      B.  the Company is under no obligation to register any subsequent proposed resale of the shares by me; *and*

      C.  the certificate evidencing the shares will be imprinted with a legend which prohibits the transfer of the shares unless such transfer is registered or such registration is not required in the opinion of counsel for the Company.

7.  *I am familiar with Rule 144.* I am familiar with Rule 144 adopted under the Securities Act, which in some circumstances permits limited public resales of "restricted securities" like the shares acquired from an issuer in a non-public offering. I understand that my ability to sell the shares under Rule 144 in the future is uncertain, and will depend upon, among other things: (i) the availability of certain current public information about the Company; (ii) the resale occurring more than one year after my purchase and full payment (within the meaning of Rule 144) for the shares; and (iii) if I am an affiliate of the Company, or a non-affiliate who has held the shares less than one years after my purchase and full payment: (A) the sale being made through a broker in an unsolicited "broker's transaction" or in transactions directly with a market maker, as said term is defined under the Securities Exchange Act of 1934, as amended, (B) the amount of shares being sold during any three-month period not exceeding the specified limitations stated in Rule 144, and (C) timely filing of a notice of proposed sale on Form 144, if applicable.

8.  *I know that Rule 144 may never be available.* I understand that the requirements of Rule 144 may never be met, and that the shares may never be saleable. I further understand that at the time I wish to sell the shares, there may be no public market for the Company's Shares upon which to make such a sale, or the current public information requirements of Rule 144 may not be satisfied, either of which would preclude me from selling the shares under Rule 144 even if the one-year minimum holding period had been satisfied.

9.  *I know that I am subject to further restrictions on resale.* I understand that in the event Rule 144 is not available to me, any future proposed sale of any of the shares by me will not be possible without prior registration under the Securities Act, compliance with some other registration exemption (which may or may not be available), or *each* of the following: (i) my written notice to the Company containing detailed information regarding the proposed sale, (ii) my providing an opinion of my counsel to the effect that such sale will not require registration, and (iii) the Company notifying me in writing that its counsel concurs in such opinion. I understand that neither the Company nor its counsel is obligated to provide me with any such opinion. I understand that although Rule 144 is not exclusive, the Staff of the SEC has stated that persons proposing to sell private placement securities other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

10.  *I know that I may have tax liability due to the uncertain value of the shares.* I understand that the Board of Directors believes its valuation of the shares represents a fair appraisal of their worth, but that it remains possible that, with the benefit of hindsight, the Internal Revenue Service may successfully

assert that the value of the shares on the date of my purchase is substantially greater than the Board's appraisal. I understand that any additional value ascribed to the shares by such an IRS determination will constitute ordinary income to me as of the purchase date, and that any additional taxes and interest due as a result will be my sole responsibility payable only by me, and that the Company need not and will not reimburse me for that tax liability. I understand that if such additional value represents more than 25% of my gross income for the year in which the value of the shares is taxable, the IRS will have 6 years from the due date for filing the return (or the actual filing date of the return if filed thereafter) within which to assess me the additional tax and interest due.

11. *Residence*. The address of my principal residence is set forth on the signature page below.

By signing below, I acknowledge my agreement with each of the statements contained in this Investment Representation Statement as of the date first set forth above, and my intent for the Company to rely on such statements in issuing the shares to me.

_____

*Purchaser's Signature*

Address of Purchaser's Principal Residence:

_____

_____

**EXHIBIT C**
**ELECTION UNDER SECTION 83(b) OF THE**
**INTERNAL REVENUE CODE OF 1986, AS AMENDED**

Internal Revenue Service

_____

_____
IRS Service Center where Form 1040 is Filed

**Re:**      **Section 83(b) Election**

The following information is submitted pursuant to section 1.83-2 of the Treasury Regulations in connection with this election by the undersigned under section 83(b) of the Internal Revenue Code of 1986, as amended (the "Code").

1.      Taxpayer  Name: _____
        Address:  _____
        _____
        Social Security Number:_____

2.      Description of property for which the election is made:
        _____ shares of common stock of OpenSpend, Inc (the "Shares"), received
        from the OpenSpend, Inc (the "Company") pursuant to a stock option award.

3.      The property was transferred to the undersigned on:_____ (Date).

4.      The taxable year for which the election is made is ____ (Current Tax Year).

5.      The nature of the restriction:  The Shares are subject to repurchase by the Company or its assignee upon the occurrence of certain events.  This repurchase right lapses with regard to a portion of the Shares based upon the continued performance of services by the taxpayer over time.

6.      Fair market value of the Shares at the time of transfer:   $_____ (_____
        Shares at $_____ per share).

7.      Amount paid for the Shares:  $____.

8.      A copy of this election has been furnished to OpenSpend, Inc, the company for which the services were performed by the undersigned.

Please acknowledge receipt of this election by date or received-stamping the enclosed copy of this letter and returning it to the undersigned.  A self-addressed stamped envelope is provided for your convenience.

Taxpayer
_____        Date: _____
Spouse of Taxpayer
_____        Date: _____
_____